[No. B057637. Second Dist., Div. Six. May 25, 1993.]

OCEAN SERVICES CORPORATION, Plaintiff and Appellant, v. VENTURA PORT DISTRICT, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are indentified as those portions between double brackets, e.g., [[/]].

## COUNSEL

Rogers & Wells, William I. Chertok, Christine A. Page, David J. Cowan and Bryan Cave for Plaintiff and Appellant.

Heily & Blase, DeWitt F. Blase, John R. Johnson and Hugh J. Haferkamp for Defendant and Appellant.

## OPINION

**GILBERT, J.**—An action is brought against a governmental entity. The governmental entity asserts as a defense the party's failure to comply with the governmental claims statute. We hold, among other things, that through its conduct a governmental entity may be estopped from asserting failure to comply with the claims statute.

We also hold the governmental entity breached a covenant of good faith and fair dealing.

In addition, the five-year mandatory dismissal statute was tolled.

Ventura Port District (VPD) appeals from a $16,971,767 judgment in favor of respondent, Ocean Services Corporation (OSC), and an order

denying its motion for judgment notwithstanding the verdict. We affirm. [[/]]*

FACTS

VPD was established in 1952 to operate and develop the Ventura Harbor, a small coastal harbor consisting of 24 parcels and 189 acres of land and water. During the first 25 years of its existence, it lacked the necessary capital to develop a commercial marina. In 1977 VPD hired Gerald Barney to act as the port district general manager and to create a comprehensive development plan.

Barney devised a plan to lease sections of the harbor for commercial development. In 1979 he offered OSC an option to lease three parcels, 3A, 3C and 5, in order to develop a commercial marina with restaurants and retail shops. The option agreement gave OSC the right to lease the property for 50 years. During the lease term it would share the rents and profits with VPD. Barney described the project as "a joint venture between private enterprise and the Port District."

The first phase of the project required that OSC construct a commercial fishing and wharf facility on parcel 3A and a marine science building on parcel 5. OSC did not expect a profit from this phase because the property was dedicated for public use. OSC could recoup its investment during the second phase of the project by constructing restaurant and retail facilities on parcel 3C. Everyone involved with the development recognized that the financial success of the entire project depended on parcel 3C.

When OSC executed the option to lease agreement on October 1, 1979, VPD failed to disclose that parcel 3C was burdened by a restrictive covenant. The restrictive covenant was in favor of STH Development Company (STH). VPD and STH had previously entered into a lease agreement to develop the other side of the harbor. In that agreement VPD had covenanted that no restaurant or retail facilities would be built on parcels 3C and 5 for 10 years.

After the option agreement was signed, OSC received a preliminary title report that made a general reference to the STH lease. Edward Jenks, president of OSC, asked Barney about the lease. Barney told him that it had been terminated, and assured him that VPD would talk to the title company and have the matter straightened out.

OSC proceeded with the project and, pursuant to the option agreement, exercised "due diligence" by expending $1.5 million for permit fees and

_____

*See footnote, *ante*, page 1762.

engineering services. VPD approved the preliminary plans on February 20, 1980, but failed to mention that STH's assignee and lender, Marina Cabrillo and Mitsui Manufacturers Bank, had filed two actions in the Los Angeles County Superior Court to enforce the restrictive covenant. On February 22, 1980, the Marina Cabrillo plaintiffs amended their complaint to allege that OSC's project violated the restrictive covenant.

Barney finally disclosed the problem in March 1980 and told Jenks the matter would be quickly resolved. He assured OSC that parcel 3C could still be developed and that VPD would stand by its promise. VPD, nevertheless, was concerned about the litigation and asked that no retail or restaurant facilities be built on parcel 5 until the restrictive covenant was removed. Because of Barney's assurances, OSC continued with the project and pre-leased 97 percent of the parcel 3C facilities.

Jenks later discovered that construction lenders were reluctant to fund the project because of the restrictive covenant. The parties agreed to extend the option period 18 months. In a letter dated September 17, 1980, Barney, on behalf of VPD, admitted that the restrictive covenants were cause for concern. He pointed out that the parties seemed to be working in a " 'gray area,' " that was not covered in the respective options or leases. In another letter, also dated September 17, 1980, Barney informed OSC that VPD was trying to settle the matter, and suggested that they develop "mutually satisfactory contingency plans in the event the matter is not resolved to the satisfaction of potential lenders."

Weeks later, the Economic Development Administration advised VPD that the delay would cause it to lose a $1.3 million grant for the parcel 3A facilities. Barney urged OSC to proceed with the project because of their understanding that VPD would take care of the restrictive covenant. Jenks agreed. OSC had already attended 49 public hearings and 1,200 meetings to obtain the necessary permits.

On November 19, 1980, the parties executed the ground leases for parcels 3A, 3C and 5. The parcel 3C lease made no mention of the restrictive covenant and expressly warranted that the property could be used for restaurant and retail purposes. Having salvaged the $1.3 million federal grant, OSC used the funds to build the commercial fishing facility.

The next phase of the development required that the parties obtain tax-exempt financing for the wharf facilities, a marine center, and a quay. OSC intended to obtain private financing for three other quays on parcel 3C, known as Fisherman's Quays 2, 3, and 4. The quays were two-story struc-tures with ocean view offices and ground floor space for three restaurants and twenty-one retail shops.

VPD devised a plan to finance construction of the wharf facilities with a 10-year, $9.5 million tax-exempt bond offering through the Municipal Funding Corporation of America (MUFCOA). VPD hired Brown & Caldwell, a major engineering and project consultant firm, to prepare a financial feasibility study for the bond offering. The report stated that the project was worth $30 million and at least 50 percent of the project revenues would come from the parcel 3C restaurant and retail operations.

In July 1981, the underwriter concluded that the bond offering would not sell unless OSC guaranteed the loan payments. OSC declined to sign the loan documents because it had no source of income until parcel 3C was built out.

Jenks was concerned about the project because the STH plaintiffs were seeking a preliminary injunction to enforce the restrictive covenant. Barney urged Jenks to go forward with the financing because of their understanding that VPD would assume responsibility for losses caused by the restrictive covenant.

Jenks wanted written assurance. Barney consulted with VPD's board of directors and gave OSC a letter on July 10, 1981, acknowledging that the restrictive covenant was VPD's problem. The letter stated that ". . . there are too many variables to allow a firm agreement at this time between OSC and VPD in the event OSC is unable to proceed due to the covenant or any litigation surrounding it. [¶] If it is acceptable to OSC, the Port District would prefer to continue with the lease purchase financing with the understanding that in the event OSC cannot proceed due to the covenant that we will negotiate towards a modification of the ground lease at that time when the facts are established."

Because of the letter, and Barney's verbal assurances, OSC signed the MUFCOA loan documents on July 15, 1981. Parcel 3A was pledged as security in a sale-leaseback agreement between VPD and the MUFCOA trustee. OSC, in turn, executed a sublease and agreed to pay VPD $1.7 million per year for 10 years. The payments would be used to service the MUFCOA loan subject to the condition that OSC could keep $1.4 million of the loan funds in an interest bearing account.

OSC started construction after the loan documents were signed. On September 8, 1981, Mitsui Manufacturers Bank, a coplaintiff in the Los Angeles action, obtained a preliminary injunction enjoining VPD and its agents from violating the restrictive covenant. OSC stopped construction on the retail and restaurant improvements but completed the remainder of the wharf facility.

On July 6, 1982, Jenks sent a letter to Barney concerning OSC's project losses. The letter confirmed that the parties would amicably settle the matter after the restrictive covenant was removed and OSC's total losses were known. Barney testified that OSC and VPD were "[v]ery cooperative. . . . [T]he principle I was operating under was no matter what the agreement said, if the two parties are working together, we could probably solve all the problems. And if the two parties couldn't work together, no amount of paper in the agreement was going to solve the problem."

In fact it came to pass that the parties could not work together. This happened when VPD terminated Barney and hired Richard Parsons to oversee the project and to act as the new port district manager. On November 15, 1982, Jenks wrote to Parsons and advised him that OSC's losses would approach $1.8 million. Parsons asked for more data because VPD's attorneys wanted to use the information to settle the Los Angeles action.

The STH plaintiffs settled for $1 million in December 1983. Several days after the settlement, VPD refused to renegotiate OSC's lease or assume responsibility for the losses caused by the restrictive covenant.

On January 3, 1984, OSC served on VPD an "Amendment to Claim and Claim" for damages. On January 20, 1984, VPD rejected this claim. On July 18, 1984, OSC filed the instant action for breach of contract, deceit, and promissory estoppel.

After the action was filed, VPD reinterpreted the lease. It increased the rent and changed the rent schedules. In 1985 Parsons demanded that OSC repair the rock revetment and common walkway areas. OSC refused to do so because the ground lease required VPD to pay for the repairs. Parsons later met with Jenks and told him, "I don't give a damn what the lease says."

On July 17, 1985, Parsons publicly announced that OSC was in default and could lose the entire project. OSC's lender, Great Western Savings, refused to refinance the parcel 3C improvements until the problem was straightened out. Having no choice in the matter, OSC paid $47,853 to cure the alleged default and agreed to the lease changes.

Thereafter, the harbor was not a safe one for OSC. It suffered other setbacks. In late 1984 a winter storm created a sand shoal at the harbor entrance. OSC asked VPD to remedy the problem because the shoal was a hazard to commercial fishermen and boaters using the marina. VPD obtained an emergency dredging permit, hired the Army Corps of Engineers to dredge the harbor, and allowed the dredging spoils to be dumped next to the project.

VPD's contractors later bulldozed the spoils into a 25- to 30-foot-high sand berm that ran the length of the leasehold's ocean view.

OSC complained about the condition because it blocked the ocean view and caused sand to blow into the buildings, boats, and cars. On January 15, 1985, it demanded that the sand berm be removed. Instead, VPD planted the area, installed an irrigation system, and made the sand berm a permanent fixture.

OSC's project losses continued to mount when it was unable to sublet parcel 3C or to get VPD to approve rent increases. Strapped for cash, it depleted the $1.4 million reserve account.

On February 9, 1987, OSC sought a chapter 11 reorganization after sustaining substantial operating losses. VPD appeared in the bankruptcy proceeding and filed a creditor's claim for breach of the ground lease and sublease purchase agreement. VPD took control of the marina facilities after OSC was evicted. On December 15, 1988, the bankruptcy action was converted to a chapter 7 liquidation. OSC and its creditors were authorized by the bankruptcy court to prosecute the instant action.

### The Trial

OSC proceeded to trial on the theory that VPD breached an implied covenant of quiet enjoyment when it failed to deliver parcel 3C free and clear of the restrictive covenant. It also claimed that VPD breached an implied covenant of good faith and fair dealing, thereby causing OSC to lose the entire project.

VPD denied liability and unsuccessfully moved for dismissal on the ground the action was barred by the claims presentation statute. (Gov. Code,[1] § 910 et seq.) During the 19-day trial, VPD contended that OSC waived the contractual breach when it signed the ground lease and MUFCOA sublease purchase agreement. According to VPD, the project failed because of adverse market conditions, excessive loan and operating costs, and OSC's mismanagement.

The jury returned a special verdict for $31,352,595 and found that OSC suffered $1.5 million damages when VPD breached the option to purchase agreement. It also found that the restrictive covenant caused OSC to lose $1,996,807 in rental income, $1,472,339 increased construction costs, and $1,873,098 in interest from the MUFCOA reserve account.

---

[1]Unless otherwise stated, all statutory references are to the Government Code.

Following the verdict, the trial court ruled on an $11 million setoff claim, representing the balance owed on the ground lease and sublease purchase agreement. It denied the setoff and held that VPD was equitably estopped from asserting the setoff. The trial court further ruled that the setoff issue was moot because the jury instructions directed the jury to consider only OSC's net losses.

VPD thereafter sought a new trial and judgment notwithstanding the verdict. The trial court denied the motion for new trial subject to the condition that the judgment be reduced $16,971,767. (Code Civ. Proc., § 662.5, subd. (b).) It ruled that the $31 million award was excessive because no deduction had been made for the outstanding debt owed on the project. ██ ██ OSC consented to the remittitur, but cross-appealed from the order.[2]

## CONTENTIONS

VPD contends, among other things, that the judgment should be reversed because (1) the case was not brought to trial within five years of commencement of the action (Code Civ. Proc., § 583.310), (2) OSC failed to make a proper statutory claim or file suit within the time periods mandated by the Tort Claims Act (§ 900 et seq.), (3) the terms of the lease did not, as a matter of law, support a finding that VPD breached an implied covenant of good faith and fair dealing [[/]].*

## DISCUSSION

### Five-year Mandatory Dismissal

██ VPD argues that the trial court abused its discretion when it denied a pretrial motion for a five-year mandatory dismissal. (Code Civ. Proc., §§ 583.310, 583.360.) Code of Civil Procedure section 583.340 tolls the five-year statute if (a) the trial court's jurisdiction was suspended, (b) stayed, or (c) where it was impossible, impracticable or futile to bring the action to trial.

Here, the five-year statute was tolled by a stay order we issued in a related action to disqualify OSC's trial counsel, Dewitt Blase. (Ventura Port District v. Blase (Super. Ct. Ventura County, No. 99066).) In that action, VPD obtained a preliminary injunction enjoining Blase from representing OSC.

[2] Such a cross-appeal is permitted. (See *Miller* v. *National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 341-345 [126 Cal.Rptr. 731].)

*See footnote, *ante*, page 1762.

Blase appealed from the order, and on June 16, 1988, obtained a writ of supersedeas staying the instant action against OSC. (B034845.) VPD proceeded to trial against Blase, but a judgment was rendered in favor of Blase by way of nonsuit. We vacated the stay in the instant action July 6, 1989.

A year later, VPD requested that the instant action be dismissed because the case had not been brought to trial within five years. (Code Civ. Proc., § 583.310.) The trial court denied the motion, finding that the five-year statute was tolled during the stay period from June 16, 1988, to July 6, 1989. (Code Civ. Proc., § 583.340, subd. (b).)

VPD contends that the trial court miscalculated the tolling period because the stay could have been vacated six months earlier. It asserts that any tolling of the five-year statute was conditioned upon OSC's "exercise of reasonable diligence." The argument is without merit.

Code of Civil Procedure section 583.340, subdivision (b), provides that the five-year period "shall be" tolled if "[p]rosecution or trial of the action was stayed or enjoined." The statute is unconditional and is intended to have uniform application. " 'This is consistent with the treatment given other statutory excuses; it increases certainty and minimizes the need for a judicial hearing to ascertain whether or not the statutory period has run.' (17 Cal. Law Revision Com. Rep. (Jan. 1984) p. 919.) It also is consistent with the general policy favoring trial over dismissal. (§ 583.130.)" (*Holland* v. *Dave Altman's R. V. Center* (1990) 222 Cal.App.3d 477, 484 [271 Cal.Rptr. 706].)

Here, the trial court's jurisdiction was suspended to maintain the parties' status quo. (Code Civ. Proc., § 923; *Voorhies* v. *Greene* (1983) 139 Cal.App.3d 989, 995 [189 Cal.Rptr. 132].) Because of the stay, VPD waited more than a year before it filed an answer to the second amended and supplemental complaint. OSC could not proceed until the stay was vacated.

The five-year statute was also tolled because the trial court lacked jurisdiction to try the action. (*Christin* v. *Superior Court* (1937) 9 Cal.2d 526, 533 [71 P.2d 205, 112 A.L.R. 1153].) Lack of jurisdiction is a second exception to the dismissal statute (Code Civ. Proc., 583.340, subd. (a)) and, for purposes of computing the tolling period, "plaintiff's diligence, or lack thereof, has no place in the analysis." (*Schwenke* v. *J & P Scott, Inc.* (1988) 205 Cal.App.3d 71, 78 [252 Cal.Rptr. 91].)

The trial court had no statutory duty to shorten the tolling period on the theory that counsel could have been more diligent in dismissing his appeal and vacating the stay order. (*Holland* v. *Dave Altman's R.V. Center, supra,*

222 Cal.App.3d 477, 484.) There is no showing that the trial court abused its discretion. (*Danielson* v. *ITT Industrial Credit Co.* (1988) 199 Cal.App.3d 645, 651 [245 Cal.Rptr. 126].)

As OSC pointed out in oral argument, *Brock* v. *Kaiser Foundation Hospitals* (1992) 10 Cal.App.4th 1790 [13 Cal.Rptr.2d 678], illustrates the principle involved here. Tolling is automatic and not subject to a "reasonable diligence" restriction. (*Id.*, at pp. 1798-1799, fn. 6.)

*Failure to Comply With the Claims Presentation Requirements*

VPD also argues that the action was barred because of OSC's failure to comply with the statutory claims provisions of section 910 et seq. Before a civil action may be brought against a public entity, a claim must first be presented to the public entity and rejected. (§ 945.4.) Here, the one-year claim provision of section 911.2 required that OSC submit a statutory claim before it filed suit for breach of contract. (§ 945.4; *Voth* v. *Wasco Public Util. Dist.* (1976) 56 Cal.App.3d 353, 360 [128 Cal.Rptr. 608]; Cal. Government Tort Liability Practice (Cont.Ed.Bar 1992) § 6.17, p. 652.)

VPD asked the trial court to consider the claims statute, first by way of a motion to dismiss, and then by way of a motion for judgment notwithstanding the verdict. VPD brought the motion to dismiss the first day of trial. The moving papers asked the trial court to rule upon "[t]he legal issues and, to the extent they may exist, *any factual questions* as to OSC's non-compliance with the Government Code provisions . . . ." (Italics added.) VPD cited *Santee* v. *Santa Clara County Office of Education* (1990) 220 Cal.App.3d 702, 711 [269 Cal.Rptr. 605] for the rule that OSC had no right to a jury trial on the issue. The trial court, after reviewing the claims and pleadings, held "that the claims statutes have been . . . complied with and/or waived . . . ."

VPD contends that the trial court abused its discretion but has no transcript of the proceedings. ■ Absent a record to the contrary, the order is presumed correct and all intendments are drawn in favor of the judgment. (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) We must presume that the trial court made whatever findings were necessary to sustain the ruling. (*Michael U.* v. *Jamie B.* (1985) 39 Cal.3d 787, 792-793 [218 Cal.Rptr. 39, 705 P.2d 362].)

■ VPD argues that as a matter of law the claims statute barred the contract action for covenant-related losses and project losses. We disagree.

According to Barney, VPD wanted to resolve OSC's damage claim without litigation and intended to do everything reasonably possible because it "created the problem, not Ocean Services . . . . [T]here was no way to know how serious it was until something reached a conclusion, therefore there was no way to deal with it in any concrete terms other than to offer our good faith to try to be reasonable and work things out as we encountered them if they were willing to go forward with the project."

The parties had exchanged letters concerning the restrictive covenant as far back as 1980. Barney's July 1981 letter memorialized an agreement to extend the period for final action on OSC's claim until the Los Angeles action was resolved. Barney stressed that the parties develop mutually satisfactory contingency plans to resolve the issue.

In July and November of 1982 the parties exchanged further correspondence confirming their prior agreement to settle OSC's claim after the restrictive covenant was removed. A letter from OSC to Parsons on November 15, 1982, advised VPD that OSC's losses would approach $1.8 million. VPD told OSC to wait and provide additional data. It did.

We conclude that VPD waived the requirements of the claims statute and was estopped from asserting that the January 1984 claim was untimely. (*Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305-306 [61 Cal.Rptr. 661, 431 P.2d 245]; *Fredrichsen* v. *City of Lakewood* (1971) 6 Cal.3d 353, 358 [99 Cal.Rptr. 13, 491 P.2d 805].) Because of VPD's correspondence and verbal assurances, OSC reasonably believed that it need not take any further action to perfect a claim against VPD. (*Bertorelli* v. *City of Tulare* (1986) 180 Cal.App.3d 432, 440 [225 Cal.Rptr. 582].) The claims statute may not be invoked to penalize a plaintiff who at the behest of a public entity has been induced not to take action, but instead to wait until the situation creating a conflict has stabilized. (*Aaron* v. *City of Los Angeles* (1974) 40 Cal.App.3d 471, 492 [115 Cal.Rptr. 162].)

The estoppel doctrine aside, we also agree with the trial court's alternate finding that OSC substantially complied with the claims statute. The 1981 correspondence, together with the amended claim, enabled VPD to make an early investigation of the facts and determine whether the problem called for litigation or settlement. (*Smith* v. *County of Los Angeles* (1989) 214 Cal.App.3d 266, 277 [262 Cal.Rptr. 754]; *Myers* v. *County of Orange* (1970) 6 Cal.App.3d 626, 637 [86 Cal.Rptr. 198].) As stated, Barney's July 1981 letter acknowledged OSC's claim and memorialized an agreement to negotiate or take final action on the claim at a later date. Such an agreement was authorized because VPD failed to give written notice of rejection of the claim within two years of accrual of the cause of action. (§§ 913, 945.6, subd. (a)(2).) We conclude that OSC's letter of November 1982 informing

VPD of its losses preserved the claim and was supplemented by the January 1984 "Amendment to Claim and Claim." (§ 910.6; Cal. Government Tort Liability Practice, *supra*, § 6.53, p. 707.)

"The Tort Claims Act . . . expressly authorizes amendment of a claim before the prescribed period for claims presentation has expired, or before final action on the claim is taken by the public entity's governing board, *whichever is later*. (Gov. Code, § 910.6.)" (Cal. Government Tort Liability Practice, *supra*, § 6.68, p. 726, italics added.) If VPD believed the 1982 letter from OSC claiming $1.8 million in losses constituted a new claim but was untimely, it was required to take action on it. (§ 910.8; *Foster* v. *McFadden* (1973) 30 Cal.App.3d 943, 947-949 [106 Cal.Rptr. 685].)

■ Where, as here, a public entity fails to give notice of defects regarding the content or timeliness of the claim, it ". . . waives any defenses based on those insufficiencies." (*Phillips* v. *Desert Hospital Dist.* (1989) 49 Cal.3d 699, 702 [263 Cal.Rptr. 119, 780 P.2d 349], fn. omitted.) Although *Phillips* v. *Desert Hospital Dist., supra,* involved a personal injury claim that was subjected to a 100-day claims presentation requirement (*id.* at p. 705, fn. 3), the same principle applies here. VPD could not treat the 1982 letter as an untimely claim or repudiation of the 1981 agreement unless it provided written notice of rejection. (§ 913.) It failed to do so.

■ VPD nonetheless argues that the second cause of action for breach of an implied covenant of good faith was barred because it raised a new theory of recovery not reflected in the January 1984 amended claim. We disagree. The second cause of action incorporates the allegations of the first cause of action and alleges that VPD breached a covenant of good faith and fair dealing before and after the suit was filed. Having reviewed the supplemental complaint, the trial court concluded that "the second cause of action does not allege a separate and distinct contract . . . . [I]t is a statement, an alternate statement of an alleged breach of the contract which is alleged as set forth in cause of action number one . . . ."

The trial court was right. The facts regarding the nature and cause of OSC's injury never changed. (*White* v. *Superior Court* (1990) 225 Cal.App.3d 1505, 1510-1511 [275 Cal.Rptr. 706].) The second amended complaint alleged that the implied covenants of quiet enjoyment and good faith were coexistent and simultaneously breached when VPD failed to remove the restrictive covenant. VPD continued to breach its contractual duties when it disavowed responsibility for the covenant-related losses, changed the lease terms, interfered with OSC's use and development of the property, and refused to remove the sand berm. A new statutory claim was not required for each damage flowing from the contractual breach.

■ VPD further complains that a fatal variance exists between the amount stated in the claims and the $31 million verdict. It asserts that the

judgment should be reduced to $1 million, the amount stated in the January 1984 claim. This argument misconstrues the Tort Claims Act.

A statutory claim need only list "[t]he amount claimed . . . as of the date of presentation . . . , including the estimated amount of any prospective injury, damage, or loss, insofar as it may be known . . . ." (§ 910, subd. (f).) The claims statute does not require that a plaintiff be clairvoyant or accurately predict his future damages. It is well settled that a plaintiff who suffers continuing damages may be awarded damages accruing after submission of the claim. (*Amador Valley Investors* v. *City of Livermore* (1974) 43 Cal.App.3d 483, 489-490 [117 Cal.Rptr. 749].) OSC had the statutory right to file a supplemental complaint for damages arising after commencement of the action. (*Bendix Corp.* v. *City of Los Angeles* (1984) 150 Cal.App.3d 921, 926 [198 Cal.Rptr. 370].)

██ VPD also argues that OSC produced no evidence to support a jury finding that it complied with the claims statute. The argument misconstrues the record. VPD elected to bifurcate the trial and have the trial court rule on all factual and legal issues regarding the claims statute. (Code Civ. Proc., §§ 597, 598; 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, §§ 155-158, pp. 156-159.) Following the trial court's ruling, VPD offered no jury instructions on the issue. ██ " 'Under the doctrine of invited error, a party may not object to the sufficiency of the evidence to support a finding against him when the lack is the result of improper exclusion of evidence at his own instance.' [Citation.]" (*Kessler* v. *Gray* (1978) 77 Cal.App.3d 284, 290 [143 Cal.Rptr. 496].)

### Section 945.6 Statute of Limitations Bar

██ VPD next argues that the contract action was time-barred. (§ 945.6.) Where, as here, a public entity gives written notice of rejection of the claim, section 945.6, subdivision (a)(1), requires that the action be filed no later than six months after service of the rejection notice. (*Dowell* v. *County of Contra Costa* (1985) 173 Cal.App.3d 896, 900 [219 Cal.Rptr. 341].) In those situations where a public entity fails to give written notice of the rejection, the action must be commenced within two years of the accrual of the cause of action. (§ 945.6, subd. (a)(2); *Lundeen Coatings Corp.* v. *Department of Water & Power* (1991) 232 Cal.App.3d 816, 827 [283 Cal.Rptr. 551].)

Here, the trial court determined that "the claims statutes have been complied with and/or waived." The first prong of section 945.6 was therefore satisfied because the complaint was filed within six months of the rejection of the January 1984 claim. (§ 945.6, subd. (a)(1).) OSC's second amended and supplemental complaint, which sought damages from 1984 to 1987, related back to the January 1984 claim and was unaffected by the

statute of limitations. (*Bendix Corp.* v. *City of Los Angeles, supra,* 150 Cal.App.3d 921, 926.)

VPD nonetheless argues that portions of the judgment were barred by the second prong of section 945.6 because some of the damage claims arose more than two years before the complaint was filed. It contends, for example, that the $1.5 million award for breach of the option agreement was time-barred because the claim accrued more than three years before the complaint was filed. The argument fails for several reasons.

First, VPD waived sovereign immunity defenses when it appeared in bankruptcy court and filed a creditor's claim. (11 U.S.C. § 106(a); 6 Collier Bankruptcy Practice Guide (1992) § 109.06, p. 109-6; *In re Cook United, Inc.* (Bankr.N.D.Ohio 1990) 117 Bankr. 301, 304-306; *In re Hughes-Bechtol, Inc.* (Bankr.S.D.Ohio 1991) 124 Bankr. 1007, 1017.)[3] ▮ "[T]he *quid pro quo* for filing a proof of claim is a partial waiver of . . . sovereign immunity. . . . [¶] Once immunity has been waived, the state has subjected itself to any liability it has to the estate relating to the claim and transaction at issue." (*In re 995 Fifth Ave. Associates, L.P.* (Bankr.S.D.N.Y. 1991) 127 Bankr. 533, 538.) ▮ Section 945.6, which is an operative part of the Tort Claims Act, was therefore waived by operation of federal law.

Second, VPD did not plead the statute as an affirmative defense to the contract claims. In its answer it alleged that the "second cause of action for tort damages is barred on account of plaintiffs' failure to timely present a claim to the District pursuant to Government Code § 900 *et seq.*"

It is true that paragraph 46 of the answer also alleged that "[t]he claims and causes of action alleged asserted in the purported Complaint are barred by the applicable statutes of limitations, including but not limited to California Code of Civil Procedure Sections 337, 337.2, 338, 339, 340 and 342." (Code Civ. Proc., § 458; *Davies* v. *Krasna* (1975) 14 Cal.3d 502, 508 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807].) The statute of limitations defense is not constructively pled by general references to Code of Civil Procedure section 337 et seq. (Code Civ. Proc., § 342; Cal. Government Tort Liability Practice, *supra,* § 6.116, p. 825.)

Even if the statute of limitations had been properly pled, it was tolled until the Los Angeles action was settled. (§ 945.6, subd. (a)(2); Cal. Government

---

[3]Title 11 United States Code section 106(a) states: "A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose."

Tort Liability Practice, *supra*, § 6.53, p. 706.)[4] Moreover, the claims period was extended. Section 912.4, subdivision (b), provides that a public entity may extend the claims period by written agreement. Here, the agreement was memorialized in the July 1981 letter agreement. The trial court concluded that such an agreement was contained in the July 1981 letter. VPD led OSC to reasonably believe that the claims statute would toll if it continued with the project.

The trial court also concluded that the claims statute was waived until the Los Angeles action was settled. We agree. This had the effect of tolling the statute of limitations as well. (*Myers* v. *County of Orange, supra*, 6 Cal.App.3d 626, 634-637; *Denham* v. *County of Los Angeles* (1968) 259 Cal.App.2d 860, 866-867 [66 Cal.Rptr. 922].) The conduct of VPD and the July 1981 letter estopped it from evoking the statute of limitations defense as well as the claims statute. (*Ibid.*)

### Jury Finding That VPD Breached a Covenant of Good Faith and Fair Dealing

VPD argues that as a matter of law the terms of the ground lease prevented any finding that it breached an implied duty of good faith and fair dealing. Interpretation of the ground lease presents a question of law for de novo review. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

We are guided by the well-established rule that ". . . the law implies in *every* contract a covenant of good faith and fair dealing. [Citations.] Broadly stated, that covenant requires that neither party do anything which will deprive the other of the benefits of the agreement. [Citation.]" (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 768 [206 Cal.Rptr. 354, 686 P.2d 1158].)

In California, the implied duty of good faith and fair dealing exists in virtually every commercial lease. (*Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 372 [6 Cal.Rptr.2d 467, 826 P.2d 710].) "One of the covenant's components which has been established in the field of commercial leases is a duty on the part of a landlord to promote the continued use and occupancy of the premises by an existing tenant. [Citations.]" (*Mitchell* v. *Exhibition Foods, Inc.* (1986) 184 Cal.App.3d 1033, 1043 [229 Cal.Rptr. 535].)

We are also persuaded that the covenant existed here because of the particular arrangement between the parties. They had a joint venture agreement

---

[4]Section 945.6, subdivision (a)(2) states in pertinent part: "If the period within which the public entity is required to act is extended pursuant to subdivision (b) of Section 912.4, the period of such extension is not part of the time limited for the commencement of the action under this paragraph."

to share the rents and profits. (*Universal Sales Corp.* v. *Cal. Etc. Mfg. Co.* (1942) 20 Cal.2d 751, 771-772 [128 P.2d 665]; *Gherman* v. *Colburn* (1977) 72 Cal.App.3d 544, 564-565 [140 Cal.Rptr. 330].)

VPD concedes that the ground lease contained an implied covenant of quiet enjoyment. It argues that a covenant of good faith and fair dealing may not be implied here; it must be express. Therefore, there was no breach. We disagree. Here, the implied covenant of good faith imposed a reciprocal duty upon the parties to do everything that the ground lease presupposed they would do to accomplish its purpose. (*Careau & Co.* v. *Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1393 [272 Cal.Rptr. 387].)

We are of the view that the two covenants overlapped to impose similar duties of care. The covenant of quiet enjoyment ". . . insulates the tenant against any act or omission on the part of the landlord, or anyone claiming under him, which interferes with a tenant's right to use and enjoy the premises for the purposes contemplated by the tenancy. [Citations.]" (*Petroleum Collections Inc.* v. *Swords* (1975) 48 Cal.App.3d 841, 846 [122 Cal.Rptr. 114].)

VPD had a contractual duty to refrain from doing anything that would ". . . deprive the other of the benefits of the agreement." (*Ellis* v. *Chevron, U. S. A., Inc.* (1988) 201 Cal.App.3d 132, 139 [246 Cal.Rptr. 863]; *Lippman* v. *Sears, Roebuck & Co.* (1955) 44 Cal.2d 136, 143 [280 P.2d 775].) Any other construction would be tantamount to a "license to steal" and absolve VPD "from liability for conduct which would make the very contract itself and the security mentioned therein wholly valueless." (*Flying Tiger Line, Inc.* v. *U.S. Aircoach* (1958) 51 Cal.2d 199, 203 [331 P.2d 37].)

Substantial evidence supports the jury's finding that VPD breached the covenant of good faith and fair dealing before and after the restrictive covenant was removed. The jury reasonably found that VPD had no express or implied contractual right to disavow responsibility for the covenant-related losses, change the terms of the lease, issue default notices in bad faith, or blight the project with a sand berm.

[[/]]*

---

*See footnote, *ante*, page 1762.

CONCLUSION

[[/]]* The judgment is affirmed. We order that the judgment be modified and reduced to $15,560,169. The parties shall pay their own costs on appeal.

Stone (S. J.), P. J., and Yegan, J., concurred.

Petitions for a rehearing were denied June 23, 1993, and the petition of appellant Ventura Port District for review by the Supreme Court was denied August 19, 1993.

---

*See footnote, *ante*, page 1762.