[No. A098729. First Dist., Div. Five. July 22, 2003.]

J. H. McKNIGHT RANCH, INC., Plaintiff and Respondent, v.
FRANCHISE TAX BOARD, Defendant and Appellant.

980

COUNSEL

Bill Lockyer, Attorney General, Randall P. Borcherding, Jack Newman and David Lew, Deputy Attorneys General, for Defendant and Appellant.

Reed Smith Crosby Heafey, Donald P. Rubenstein, Paul D. Fogel and Jayne E. Fleming for Plaintiff and Respondent.

**OPINION**

**GEMELLO, J.**—In 1995, the Franchise Tax Board (Board) informed the J. H. McKnight Ranch, Inc. (McKnight) that it had underpaid state taxes by approximately $97,000. McKnight protested without success, then paid the disputed tax and filed a refund claim. In discussions with McKnight, the Board reiterated the view that the tax was owed, but offered to deny the refund claim summarily so that McKnight could proceed in court. McKnight accepted the offer and filed suit.

The Board now concedes that under the contested liability doctrine, no tax was ever owed. It nevertheless suggests that because of its summary denial of McKnight's refund claim, McKnight failed to exhaust its administrative remedies and the Board should be allowed to retain the excess tax.

Equity does not allow such a result. The common law rule that the government could not be estopped was abandoned in California more than a century ago. ██ Where equity requires it, as where a government agent's actions have induced noncompliance with procedural requirements, the government may be estopped from asserting those procedural bars against a citizen's recovery. We affirm the trial court's grant of judgment in favor of McKnight.

### FACTUAL AND PROCEDURAL BACKGROUND

McKnight operates a rice farm in Butte County. In 1980, Bank of America represented to McKnight that it had substantial farm management and marketing experience, and persuaded McKnight to consolidate its banking with Bank of America. Bank of America extended annual lines of credit to McKnight and exerted substantial influence over McKnight's farming operations over the next six years. Between 1980 and 1986, McKnight paid Bank of America more than $13,000,000 in principal and interest on approximately $12,600,000 in loans. As of 1989, Bank of America contended approximately $2.4 million was still owed. McKnight disputed this amount.

In 1989, McKnight sued Bank of America for breach of fiduciary duty, misrepresentations, misappropriation of funds, and assorted other malfeasance resulting in significant losses to McKnight. The parties settled in 1990, with Bank of America discharging the purported $2.4 million debt for a payment of $150,000 and dismissal of the suit. McKnight did not report the discharge as income on its 1990 income tax return.

The Board audited McKnight's 1990 return. In June 1995, it determined that $991,445 of the debt discharged by Bank of America was taxable income and assessed $97,258 in additional taxes.

In November 1995, McKnight filed a protest of the assessment. McKnight's protest contended that the $991,445 was not taxable income under the tax benefit rule and the contested liability doctrine. In 1996, the Board's Protest Unit denied McKnight's protest.

McKnight attempted to resolve the dispute with the Board's Settlement Bureau. That effort failed.

In 1997, McKnight paid the disputed $97,258 in additional taxes and filed an amended 1990 return and refund claim. In February 1999, the Board denied McKnight's refund claim. McKnight thereupon filed suit for refund in superior court.

The parties submitted a set of stipulated facts and documents. After a one-day trial, the court issued a statement of decision ruling in favor of McKnight. On March 14, 2002, it entered judgment for McKnight, awarding it the $97,258 in overpaid taxes plus pre- and postjudgment interest.

The Board has timely appealed. On appeal, it contends that the trial court ignored McKnight's failure to exhaust its administrative remedies in proceedings before the Board.

## DISCUSSION

I. *Standard of Review*

 When the parties have submitted a tax matter on stipulated facts and documentary evidence and there is no conflict in that evidence, this court is confronted with questions of law rather than fact. We independently review the record and are not bound by the trial court's determination. (*Wilson v. Franchise Tax Bd.* (1993) 20 Cal.App.4th 1441, 1450 [25 Cal.Rptr.2d 282].) However, when the trial court makes factual findings on disputed issues, we review those findings under the substantial evidence test. (*Tenneco West, Inc. v. Franchise Tax Bd.* (1991) 234 Cal.App.3d 1510, 1521 [286 Cal.Rptr. 354].)

The Board contends that the trial court erred by failing to draft its own statement of decision, and that we should therefore review de novo even those findings that hinged on disputed evidence. (*Estate of Larson* (1980) 106 Cal.App.3d 560, 567–568 [166 Cal.Rptr. 868].) In *Estate of Larson*, the appellate court reversed because the record demonstrated that the trial court had misapprehended the legal standards governing a particular factual finding. In such circumstances, the appellate court declined to apply a substantial evidence standard of review because the trial court never weighed the evidence with the correct standard in mind. (*Ibid.*)

*Estate of Larson* does not support a departure from the substantial evidence standard here. In order to free time to consider the merits of parties' disputes, state trial courts routinely solicit draft statements of decision. "The preparation of a statement of decision should place no extra burden on the trial courts. A party may be, and often should be, required to prepare the statement." (*Whittington v. McKinney* (1991) 234 Cal.App.3d 123, 129, fn. 5 [285 Cal.Rptr. 586].) A trial court may then select which findings it agrees with as supported by the evidence and adopt them, rather than having to prepare a statement of decision from scratch. That a court does so creates no inference that it has failed to engage in a thoughtful weighing of the evidence, and does not license us to ignore its findings of fact. (See *Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 310–311 [130 Cal.Rptr.2d 436].) Here, the trial court adopted virtually all of McKnight's proposed statement of decision, but struck the portion with which it disagreed, a finding that the Board's position was without substantial justification and that McKnight was entitled to attorney fees. We decline to displace the trial court from its role as fact finder and review its findings de novo. Instead, we adhere to the traditional substantial evidence test.

II. *As a Matter of Substantive Tax Law, McKnight Owed No Tax Under the Contested Liability Doctrine*

After eight years, the Board offers no substantive rebuttal to McKnight's argument that it owed no tax under the contested liability doctrine. Under that doctrine, the purported debt discharged by the Bank of America was not taxable.

Ordinarily, the discharge of a loan will give rise to taxable income. "The discharge-of-indebtedness doctrine applies when a taxpayer who has incurred a financial obligation is thereafter relieved of liability, in whole or in part. When that happens, the taxpayer recognizes taxable income equal to the difference between the initial obligation and the amount, if any, paid to discharge that obligation." (*Estate of Smith v. C.I.R.* (5th Cir. 1999) 198 F.3d 515, 530.)[1] This is so because "[b]orrowed funds are excluded from income in the first instance because the taxpayer's obligation to repay the funds

---

[1] In instances where federal law and California law are the same, as with Internal Revenue Code section 61 and Revenue and Taxation Code section 24271, rulings and regulations dealing with the IRC are persuasive authority in interpreting the California statute. (E.g., *Calhoun v. Franchise Tax Bd.* (1978) 20 Cal.3d 881, 884 [143 Cal.Rptr. 692, 574 P.2d 763]; *Spurgeon v. Franchise Tax Board* (1984) 160 Cal.App.3d 524, 530 [206 Cal.Rptr. 636] [federal interpretation of definition of "income" persuasive].)

offsets any increase in the taxpayer's assets; if the taxpayer is thereafter released from his obligation to repay, the taxpayer enjoys a net increase in assets equal to the forgiven portion of the debt and the basis for the original exclusion thus evaporates." (*United States v. Centennial Savings Bank FSB* (1991) 499 U.S. 573, 582 [113 L.Ed.2d 608, 111 S.Ct. 1512].)

■ However, an exception arises when the "discharge" results from a dispute over whether the greater amount actually was owed. "Under the contested liability doctrine, if a taxpayer, in good faith, disputed the amount of a debt, a subsequent settlement of the dispute would be treated as the amount of debt cognizable for tax purposes. The excess of the original debt over the amount determined to have been due is disregarded for both loss and debt accounting purposes." (*Zarin v. C.I.R.* (3d Cir. 1990) 916 F.2d 110, 115.) The law thus accepts the parties' fixing of the amount of the debt and treats the greater asserted amount as a nullity.

Here, McKnight contends that it disputed in good faith the amount it owed the Bank of America. Consequently, under the contested liability doctrine, the Bank of America's cancellation of $2.25 million of the purported $2.4 million debt owed by McKnight would not be taxable income, but simply a book-keeping consequence of the parties' liquidation of the amount of the disputed debt. At the close of trial, the trial court agreed with McKnight, adopted McKnight's proposed statement of decision, and held that under contested liability principles McKnight owed no tax on the cancelled portion of the Bank of America debt.

On appeal, the Board does not dispute this conclusion. At oral argument, it expressly conceded that the contested liability doctrine exempted the cancelled portion of the debt from taxation. We thus treat it as established that McKnight did not owe the $97,258 it paid when it filed its amended 1990 return.[2]

III. *The Board Had Actual Notice of McKnight's Contested Liability Argument in the Course of Resolving the Refund Claim*

Notwithstanding the fact that substantively, no tax was owed, the Board contends that McKnight should be barred from a refund for procedural reasons. It argues that the trial court lacked jurisdiction to order a refund based on the contested liability doctrine because McKnight failed to exhaust its administrative remedies. We disagree.

---

[2] Because the Board concedes the merits of McKnight's position on the contested liability doctrine, we need not address whether a second doctrine, the tax benefit doctrine, also shielded McKnight from additional taxation.

Under Revenue and Taxation Code section 19322, "Every [administrative] claim for refund shall be in writing, shall be signed by the taxpayer or the taxpayer's authorized representative, and shall state the specific grounds upon which it is founded."[3] An administrative claim for refund is a prerequisite to filing suit: "[A]fter payment of the tax and denial by the Franchise Tax Board of a claim for refund, any taxpayer claiming that the tax computed and assessed is void in whole or in part may bring an action, upon the grounds set forth in that claim for refund, against the Franchise Tax Board for the recovery of the whole or any part of the amount paid." (§ 19382.)

In essence, the Board argues that these statutes set out a pleading requirement (has the taxpayer pleaded a particular ground within the four corners of its filed refund claim?), while McKnight argues that the statutes set out a notice requirement (has the taxing authority been given notice of a particular ground in the course of litigating the refund claim?). ■ We agree with McKnight and conclude that because the Board had actual notice of McKnight's contested liability argument, McKnight exhausted its administrative remedies.

When interpreting and applying sections 19322and 19382, our task is to " 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.]" (*People v. Coronado* (1995) 12 Cal.4th 145, 151 [48 Cal.Rptr.2d 77, 906 P.2d 1232].) Thus, we focus on the Legislature's intent in imposing administrative exhaustion requirements for tax refund actions. "The purpose of these statutory [exhaustion] requirements is to ensure that the Board receives sufficient notice of the claim and its basis. [Citation.] The Board then has an opportunity to correct any mistakes, thereby conserving judicial resources. [Citation. ]" (*Preston v. State Bd. of Equalization* (2001) 25 Cal.4th 197, 205–206 [105 Cal.Rptr.2d 407, 19 P.3d 1148] (*Preston*).[4]) Section 19322 "requires no particular form; the claim only must be in writing and state the grounds therefor. Indeed, the purpose of the statute is to put the board on notice of a claim ...." (*Wertin v. Franchise Tax Bd.* (1998) 68 Cal.App.4th 961, 977 [80 Cal.Rptr.2d 644].)

■ Satisfaction of this goal—notice to the Board so that it may rectify mistakes and conserve judicial resources—does not hinge on whether a particular issue is recited expressly in the initial claim for refund. If the Board has notice of the taxpayer' s argument from whatever source during the course of resolving the claim for refund, it has the opportunity to reevaluate

---

[3] All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

[4]*Preston* involved an identical exhaustion requirement applicable to sales and use tax. (See §§ 6904, 6932.) Because the exhaustion statutes for sales and use tax and income tax are identical, we treat authority applicable to either set of statutes as equally persuasive.

its position, reach the correct result, and obviate the need for a subsequent lawsuit. We see no basis for construing the statutes setting out the administrative exhaustion requirement so as to ignore actual notice the Board may have had from sources other than the four corners of the initial claim.

The Supreme Court has at least implicitly agreed with this conclusion. In *Wallace Berrie & Co. v. State Bd. of Equalization* (1985) 40 Cal.3d 60 [219 Cal.Rptr. 142, 707 P.2d 204], the taxpayer did not expressly challenge a State Board of Equalization regulation in its refund claim. The Board of Equalization argued that this constituted a failure to exhaust administrative remedies and barred further judicial proceedings. The Supreme Court concluded that the refund claim at least "indirectly" challenged the regulation. More important for our purposes, it held that whether or not the refund claim actually raised the issue, the Board of Equalization's subsequent conduct demonstrated that the Board of Equalization was aware of the issue and thus the exhaustion doctrine did not preclude the taxpayer's challenge: "Moreover, any question as to whether the refund claim actually raised the issue...was dispelled by the Board's subsequent trial stance [addressing the issue on the merits]. [¶] Although Berrie's refund claim might have been drafted with greater clarity, it appears that the Board was well aware that Berrie was challenging the validity of Regulation 1670(c). On this record, we cannot say that Berrie failed to exhaust its administrative remedies prior to filing suit challenging the regulation." (*Id.* at p. 66, fn. 2.) The Supreme Court's reasoning suggests that actual notice of the taxpayer's position is sufficient to satisfy exhaustion requirements.

Similarly, in *Jimmy Swaggart Ministries v. State Bd. of Equalization* (1988) 204 Cal.App.3d 1269 [250 Cal.Rptr. 891], the court looked beyond the initial claim to determine whether the Board had notice of the ground for refund. The court found a failure to exhaust, but only after considering the entire record before the Board and determining that the taxpayer had not raised the claim. (See *id.* at pp. 1291–1292.)

In arguing the absence of exhaustion, the Board relies principally on *Shiseido Cosmetics (America) Ltd. v. Franchise Tax Bd.* (1991) 235 Cal.App.3d 478 [286 Cal.Rptr. 690] (*Shiseido*). We do not find *Shiseido* applicable. In *Shiseido*, the taxpayer neglected to file a post-payment refund claim. (*Id.* at pp. 491-492.) Consequently, it failed to exhaust its administrative remedies. *Shiseido* thus stands for the unexceptional, and statutorily clear, requirement that a taxpayer must file a post-payment refund claim before proceeding with a suit for refund. It has no relevance where, as here, a post-payment refund claim *was* filed. (See *Barclay's Bank Internat. Ltd. v. Franchise Tax Bd.* (1992) 10 Cal.App.4th 1742, 1750 [14 Cal.Rptr.2d 537].)

■ Our conclusion that exhaustion hinges on actual notice, not the precise language of the initial claim, comports with long-standing policy concerning refund claims. "It has long been the policy of California courts to liberally construe claims for refund of taxes. 'In recognition of the reality that many, if not most, applicants are laymen who would be denied hearings if formalized technical rules were followed, it has been the judicial policy of this state to construe such applications liberally in favor of the applicant. It has been stated that an application is adequate and "the purpose of the statutory requirement is served if the board may know from said application 'or have some reasonable means of ascertaining' therefrom what the claim of the applicant is, to the end that such claims may be investigated by the assessing authorities prior to the hearing." [Citation.]' [Citation.]" (*Focus Cable of Oakland, Inc. v. County of Alameda* (1985) 173 Cal.App.3d 519, 526–527 [219 Cal.Rptr. 95].)

We decline to elevate form over function by disregarding matter outside the initial refund claim. Instead, we consider whether on the evidence before it the trial court could conclude that the Board had actual notice of McKnight's contested liability argument. We hold that the trial court could so conclude. The evidence demonstrates that the Board was aware of McKnight's contested liability argument.

McKnight argued the contested liability doctrine in its original protest of the Board's audit conclusions. After its protest was denied, it paid the disputed amount and filed a claim for refund. McKnight's initial claim for refund did not recite the contested liability doctrine as an express basis for refund of the tax, but it did indicate that McKnight was challenging the denial of its original protest.[5] In processing the refund claim, Board auditor Nathan Greve (Greve) reviewed the protest hearing report, including McKnight's assertion of the contested liability doctrine:

[McKnight's Attorney]: You were given possession of certain materials on the history of this claim; is that true?

[Greve]: Well, no. Actually, what happens is the claim is assigned to me. We research to make sure there aren't any other issues involving this particular taxpayer that particular year. We found there had been an actual

---

[5] McKnight filed an amended return, which stated in relevant part, "We are amending the tax return to exclude $1,045,783 from net income under Internal Revenue Code Section 111 and California Revenue Code Section 17131 (The Tax Benefit Rule). *This amount has been previously disallowed by the Franchise Tax Board Protest Unit. We are protesting this disallowance* and, if this claim for refund is denied, we intend to file a lawsuit in the California Superior Court in Sacramento." (Italics added.)

assessment issued and that there had been a protest of that. And then I ordered those files up and looked at those files. And upon examining the claim—

"Q: So you looked at the protest file in examining the [refund] claim?

"A: Yes, that's true.

"Q: You looked at all the materials in the protest file?

"A: Yes, we did.

"Q: Did you?

"A: Yes.

"Q: And you read those materials thoroughly to understand what had happened?

"A: Yes, I did. [¶] … [¶]

"Q: Are you aware that the McKnights had raised in a protest hearing the issue of the contested liability doctrine?

"A: Yes.

"Q: You were?

"A: Yes."

Despite that awareness, the Board's position did not change. On March 18, 1998, after reviewing the claim file, Greve wrote McKnight: "The information contained within the audit and protest hearing report appears to support the assessment as issued."

Nevertheless, the Board contends that McKnight failed to exhaust its administrative remedies because according to Greve, he was unaware that McKnight still was pressing the contested liability doctrine when he wrote the March 1998 letter. We disagree. Other evidence suggests Greve knew or soon learned that the contested liability doctrine was still at issue. In an April 15, 1998, letter to one of McKnight's attorneys, Carl Stoney, Greve acknowledged multiple "issues" still in dispute. Stoney testified that he discussed with Greve "the legal issues, *same things I discussed at the lower level*." (Italics added.) In addition, the claim for refund indicated that McKnight was

"protesting the disallowance" by the Board of its exclusion from income, a statement which could be interpreted to incorporate by reference the panoply of arguments raised and rejected in the protest proceeding. (See *Wertin v. Franchise Tax Board, supra,* 68 Cal.App.4th at pp. 976-977 [incorporation by reference of protest arguments into refund claim sufficient to put Board on notice].)

■ In any event, whether or not the Board's auditor subjectively believed McKnight still was pressing the contested liability is not dispositive. In the course of processing the refund claim, the Board received notice of the relevant facts surrounding the claim and notice of a legal doctrine under which, indisputably, McKnight owed no tax. The Board's auditor thus had the opportunity to rectify the Board's mistakes in issuing the initial assessment and denying the subsequent protest.

We affirm as supported by substantial evidence the trial court's findings that the Board had actual notice of the facts and law supporting McKnight's entitlement to a refund. Because the Board had actual notice of McKnight's contested liability argument, the purposes underlying the administrative exhaustion requirement have been served, and we hold that McKnight satisfied the initial statutory exhaustion requirements.[6]

*IV. The Board Is Estopped from Asserting That McKnight Failed to Exhaust Its Administrative Remedies*

The Board raises a second exhaustion argument. It contends that even if McKnight adequately raised the contested liability doctrine, McKnight is barred from recovering its unowed tax because it failed to pursue its refund claim to a merits-based denial. According to the Board, it denied McKnight's refund claim only after McKnight failed to provide information necessary to process the claim. The trial court held that the Board was estopped from challenging McKnight's exhaustion of its remedies. We agree.[7]

The doctrine of equitable estoppel "rests firmly upon a foundation of conscience and fair dealing." (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 488 [91 Cal.Rptr. 23, 476 P.2d 423] (*Mansell*).) "At common law, estoppel was unavailable against the government. We have long held, however, that estoppel may be asserted against the government 'where justice and

---

[6] We agree with the Board that inclusion of an express reference to the contested liability doctrine would have left no doubt as to whether the issue was raised and would have simplified the processing of the claim for both the Board and the courts. In this case, because the Board received actual notice from other sources, we conclude that the omission is not fatal to McKnight's claim.

[7] McKnight has moved to strike portions of the Board's reply brief devoted to this argument. We deny the motion.

right require it' (*City of Los Angeles* v. *Cohn* (1894) 101 Cal. 373, 377 [35 P. 1002]), and we have applied the doctrine against government entities in a variety of contexts." (*Lentz* v. *McMahon* (1989) 49 Cal.3d 393, 399, fn. omitted [261 Cal.Rptr. 310, 777 P.2d 83] (*Lentz*).)

The standard for applying estoppel against the government is settled. "The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*Mansell, supra,* 3 Cal.3d at pp. 496–497.) ■ *Mansell* and its progeny thus establish a two-part inquiry. First, a court must determine whether the traditional elements necessary for assertion of an estoppel against a private party are present. These elements include the following: "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." (*Strong* v. *County of Santa Cruz* (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264].) Second, the court must weigh the equities and consider the impact on public policy of permitting an estoppel in a given case. The existence of an estoppel is a factual question (*Aetna Casualty & Surety Co.* v. *Humboldt Loaders, Inc.* (1988) 202 Cal.App.3d 921, 930 [249 Cal.Rptr. 175]); thus, we review the trial court's conclusion for substantial evidence.

■ Under this standard, estoppel may be appropriate when "a government agent has negligently or intentionally caused a claimant to fail to comply with a *procedural* precondition" to recovery and denial of recovery would cause great hardship. (*Lentz, supra,* 49 Cal.3d at pp. 401–402; see *Robinson* v. *Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 244 [5 Cal.Rptr.2d 782, 825 P.2d 767] [collecting cases in which government was estopped after it misled claimants].) Thus, for example, a government agency that leads a private party to inaction through correspondence and verbal assurances concerning the resolution of a dispute may be estopped from asserting failure to comply with administrative claim procedures as a defense. (*Ocean Services Corp.* v. *Ventura Port Dist.* (1993) 15 Cal.App.4th 1762 [19 Cal.Rptr.2d 750] (*Ocean Services*).) In *Ocean Services*, Ocean Services Corporation entered into a joint venture with the Ventura Port District to develop the Ventura Harbor. (*Id.* at p. 1768.) When problems developed with the venture, the port district asked Ocean Services Corporation to wait for resolution of any claim. Ocean Services Corporation agreed. (*Id.* at p. 1776.) When litigation ensued, the port district asserted that any claim was barred by Ocean Services Corporation's failure to file a timely administrative claim.

(*Id.* at p. 1775.) The court disagreed, and held that the port district's actions estopped it from asserting the procedural defense.

This case is analogous to *Ocean Services*. Here, there was substantial evidence that the Board introduced the possibility of an early termination of McKnight's claim as a way to expedite resolution in court. When the parties could not reach agreement on the merits, Greve sought additional information, but also "asked if, given that [he] could not make a settlement offer, and no one else at FTB was in a position to offer a settlement did you wish to continue the audit or did you wish for me to deny the claim so you could continue on to court or the [State Board of Equalization]?" McKnight accepted the offer of an early termination and filed suit. The trial court could conclude that Greve made the offer with the expectation that it might be accepted, and that McKnight might proceed directly to court in reliance on this offer. Having proposed an early termination so that McKnight could proceed to court, the Board cannot now be heard to argue that the early termination is insufficient and that McKnight was required to do more to exhaust its claims.

In addition, we consider the equities in favor of an estoppel compelling. On the one hand, denial of an estoppel would permit the Board to retain approximately $97,000 that was never owed by the taxpayer. On the other hand, a ruling in favor of the taxpayer would not impair the public policy in favor of exhaustion of remedies significantly. The exhaustion of remedies doctrine exists to allow an agency to apply its expertise before court resources are called upon, with the expectation that some lawsuits will be rendered unnecessary (because the agency corrects a mistake) and the remainder will proceed on a better-developed record. (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 85 [276 Cal.Rptr. 130, 801 P.2d 373]; *Preston, supra,* 25 Cal.4th at p. 206.) Here, the Board was alerted to the relevant legal principle and had facts before it showing that that legal principle entitled McKnight to a refund. Over the course of years of proceedings, it had the opportunity to change its mind and obviate the need for a lawsuit. It nevertheless adhered to its position that the tax was owed up until this appeal. Ruling for the Board on exhaustion grounds would do little to encourage administrative resolutions in the future.

The Board contends that it should be exempt from application of the doctrine of estoppel because of the strong public policy in favor of protecting the public fisc. *Transamerica Occidental Life Ins. Co. v. State Board of Equalization* (1991) 232 Cal.App.3d 1048 [284 Cal.Rptr. 9] (*Transamerica*) spells out this policy. In *Transamerica*, an insurance company brought a refund action, claiming that the lower of two tax rates should apply to certain premiums. The insurer contended, inter alia, that the Department of Insurance

and the Board of Equalization had indicated that the lower rate applied, and that it relied upon this advice. The court rejected the argument, pointing out that "[a]lthough equitable estoppel may apply to government actions where justice and right so require, 'estoppel will not be applied against the government if the result would be to nullify a strong rule of policy adopted for the benefit of the public [citations] or to contravene directly any statutory or constitutional limitations. [Citation.]' " (*Id.* at p. 1054, quoting *People ex rel. Franchise Tax Bd. v. Superior Court* (1985) 164 Cal.App.3d 526, 551 [210 Cal.Rptr. 695].) "Specifically," the court explained, " 'the state is not estopped from collecting a tax which was due and owing, even though the state's representatives may have previously adopted an incorrect interpretation of the law and advised the public that no taxes would become due on a particular transaction or transactions.' " (*Transamerica,* at p. 1055, quoting *Fischbach & Moore, Inc. v. State Bd. of Equalization* (1981) 117 Cal.App.3d 627, 632 [172 Cal.Rptr. 923] (*Fischbach & Moore*); accord, *Woosley v. State of California* (1992) 3 Cal.4th 758, 785 [13 Cal.Rptr.2d 30, 838 P.2d 758].) The Board argues that under *Transamerica,* it cannot be bound by its representative's actions in processing the refund claim.

The Board overlooks a critical distinction between this case and cases like *Transamerica.* In *Transamerica,* tax was in fact owed. The bar against estoppel in such cases is "designed to discourage corrupt collusion between government officers and taxpayers to the detriment of the state's revenues." (*Fischbach & Moore, supra,* 117 Cal.App.3d at p. 632.) Here, in contrast, as a matter of substantive tax law no tax was due. McKnight seeks to invoke estoppel against assertion of a procedural barrier to recovery. As the Supreme Court recognized in the context of welfare benefits in *Lentz,* there is a world of difference between invocation of estoppel to excuse a procedural precondition to recovery and invocation of estoppel to defeat substantive limitations on recovery. "Estoppel against [the government's] assertion of purely *procedural* preconditions and limitations on benefits, when the [government] itself is responsible for the procedural default, will not defeat the underlying statutory policy of safeguarding accurate and orderly administration of the welfare system. The policy considerations may well be different, however, when *substantive* preconditions of benefits are at issue." (*Lentz, supra,* 49 Cal.3d at p. 401.) ▪ Because this case involves the use of estoppel to defeat a procedural barrier to the recovery of money never owed, equity will allow it, and "justice and right require it." (*Id.* at p. 399.)

## DISPOSITION

The judgment is affirmed.

Jones, P. J., and Stevens, J., concurred.

A petition for a rehearing was denied August 19, 2003, and the opinion was modified to read as printed above.