Filed 3/6/15  Marriage of Diamante and Hat CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re the Marriage of SHARON and MICHAEL HAT. | C069310 |
| SHARON DIAMANTE,<br><br>Appellant,<br><br>v.<br><br>MICHAEL HAT,<br><br>Appellant. | (Super. Ct. No. FL303708) |

In this action, the trial court ordered former husband Michael Hat to pay child and spousal support arrearages to former wife Sharon Hat (Diamante).  The court also ordered Michael to pay $4,130 in attorney fees under Family Code section 271 but denied both parties' requests for additional attorney fees under the same statute.

Both parties appeal.

1

Michael contends the trial court erred by failing to offset his support arrearages with money he paid to Sharon or, in the alternative, to find that Sharon was equitably estopped from claiming arrearages. Sharon contends that the trial court erred by not awarding additional attorney fees under Family Code section 271.

Finding no error, we affirm.

BACKGROUND

Reading Michael's brief is like being invited into a lengthy conversation midway. Much background is left unstated (or unsupported by reference to the record on appeal (Cal. Rules of Court, rule 8.204(a)(1)(C))), giving the contentions an unattached and purely theoretical flavor. Using Sharon's brief and our own review of the record as guidance, we start with a summary of the proceedings in this case, but we recount many of the facts and the trial court's findings in the Discussion as they become relevant.

Michael and Sharon married in 1982 and divorced in 2000. They have four children, born in 1984, 1986, 1990, and 1993. In 2000, they stipulated in open court that Michael would pay Sharon child ($4,400) and spousal ($2,000) support totaling $6,400 per month.

In July 2001, Michael, who owned grape vineyards and wineries, filed a chapter 11 bankruptcy petition. A dispute between Michael and Sharon arose concerning the proceeds from the sale of a property known as Vista Soledad. The proceeds, totaling $1,730,139.31, were in Sharon's possession. Michael claimed the proceeds were community property, subject to the bankruptcy estate, while Sharon claimed the proceeds were either her separate property or community property not subject to the bankruptcy estate. The parties eventually entered into an agreement concerning the proceeds of the Vista Soledad sale, and the agreement was approved by the bankruptcy court. Sharon received $450,000, and the remainder went to the bankruptcy estate. As part of the compromise, Michael and Sharon agreed to "suspend all family law issues until December 31, 2003. During that time, [Sharon] will not seek any spousal support from

2

[Michael] and [Michael] will not seek any spousal support from [Sharon]. The [$450,000] shall be in full and complete satisfaction of all supposal [*sic*] support obligations of [Michael] to [Sharon] through December 31, 2003."

Complications arose in Michael's bankruptcy because of Sharon's interest in various properties. Also, Michael and Sharon decided to try to reacquire some of the properties, to some extent using Sharon's interest in the property or her right to buy those properties from the bankruptcy estate.

Michael and Sharon owned Pond Ranch, which was in foreclosure when Michael filed his bankruptcy petition. The bankruptcy trustee abandoned the property, and Michael and Sharon were able to sell it. As part of the sale, Sharon retained 40 percent of Pond Ranch, half of which she later transferred to Michael. The parties disputed where the capital for the transaction came from, but they both eventually received distributions of more than $2.6 million in income from Pond Ranch. Michael claimed that he was entitled to a setoff of his child and support arrearages based on the capital contribution he made to the Pond Ranch transaction, but the trial court rejected the claim because the parties agreed there would be no capital contribution reimbursement.

The attempt of Sharon and Michael to buy another property in the bankruptcy estate, Capello Winery, resulted in litigation with another prospective buyer. In May 2005, the parties and the bankruptcy trustee entered into an agreement: Capello Winery would be sold to the other buyer and Sharon would receive $2,000,000 in full satisfaction of her rights with respect to this and all other property in the bankruptcy estate.

There were several other property transactions involving the parties. We recount those that are relevant to this appeal in the Discussion.

In July 2007, Sharon sent Michael a letter stating that she intended to initiate a proceeding to collect child and spousal support that Michael had not provided after December 2003.

3

In September 2007, Michael sued Sharon alleging, among other things, that Sharon had breached various agreements relating to their cooperation in reacquiring properties from the bankruptcy estate. The trial court granted Sharon's motion for summary judgment against Michael, and in November 2012 we affirmed the resulting judgment. (*Hat v. Stevens* (Nov. 19, 2012, C064791) [nonpub. opn.].)

In February 2008, Sharon petitioned the trial court for a determination of child and spousal support arrearages. In response, Michael sought modification of his support obligations. The trial court first tried the issue of whether Michael owed child and spousal support after December 2003. The court found that Michael's support obligations resumed on January 1, 2004, after the expiration of the agreement to suspend family law issues.

After the second phase of the trial (presided over by a different judge), the trial court issued a statement of decision concluding that Michael owed support arrearages that accrued from January 2004 to February 2008, in the amount of $258,000. The court also modified support retroactive to Michael's filing of the petition to modify, so that Michael owed $48,313 for the period from the filing of the petition to May 2011.

Both Michael and Sharon argued that the other should be sanctioned and be ordered to pay attorney fees under Family Code section 271, citing the behavior of the other party in the litigation. The trial court denied Michael's claim entirely and denied Sharon's claim except as to $4,130 for Michael's attempt to disqualify counsel for Sharon.

## DISCUSSION

### I

*Alleged Support Offsets*

Michael contends that his support arrearages were satisfied or offset by several dealings he had with Sharon involving property and cash. The trial court, however, rejected Michael's attempts to have the offsets applied because it found the property and

4

cash were part of business dealings between Michael and Sharon. We consider the law concerning arrearages and apply it to each of Michael's contentions. In the end, we conclude that the trial court properly found that Michael did not satisfy any of the support obligations.

A. *Law Regarding Preexisting and Business Debts*

A child or spousal support order or judgment can be modified or terminated only prospectively and may be made retroactive only to the date a motion to modify was filed. (Fam. Code, §§ 3651, subd. (c); 3653, subd. (a).) Accrued arrearages are treated like a money judgment. (*In re Marriage of Everett* (1990) 220 Cal.App.3d 846, 854.)

Generally, a first party owing money to a second party may offset the amount owed by any amount the second party owes to the first party. (*Keith G. v. Suzanne H.* (1998) 62 Cal.App.4th 853, 859.) But this general rule does not necessarily apply to child or spousal support arrearages. The application of setoff to support arrearages was discussed by the California Supreme Court in *Keck v. Keck* (1933) 219 Cal. 316, 320 (*Keck*) and the First Appellate District, Division One, in *Williams v. Williams* (1970) 8 Cal.App.3d 636 (*Williams*).

In the 1920's, Arthur and Lizzie Keck were husband and wife. Arthur was declared incompetent by a court, and Lizzie was named his guardian. Arthur was restored to capacity in 1926 and, after a final settlement of the guardianship accounts in 1930, a court found that Lizzie owed Arthur $1,896.26 as a result of her use of funds during Arthur's incompetency. Lizzie did not pay the judgment. (*Keck, supra,* 219 Cal. at p. 319.)

Lizzie filed for divorce and, in 1931, a year after the settlement of the guardianship accounts, the superior court ordered Arthur to pay $100 per month to Lizzie as alimony because Arthur was worth $50,000 and Lizzie had no source of support. (*Keck, supra,* 219 Cal. at pp. 317, 319.)

5

In 1932, the superior court issued an order to show cause why Arthur should not be punished for contempt for failing to make alimony payments to Lizzie. The court found that Arthur owed $2,587.50 in arrearages, but it ordered Arthur to pay $1,000 in full satisfaction of the arrearages. Lizzie appealed. (*Keck, supra,* 219 Cal. at pp. 317-318.)

On appeal, Arthur argued that, because Lizzie owed him $1,896.26 for the guardianship settlement and he owed Lizzie $2,587.50 in arrearages, an order that he pay $1,000 to Lizzie constituted full payment because, subtracting what Lizzie owed him for the guardianship settlement from what he owed Lizzie in arrearages, the net amount he owed Lizzie was only $691.24. (*Keck, supra,* 219 Cal. at p. 319.)

The Supreme Court rejected Arthur's argument based on two separate but related legal analyses: (1) support is intended to provide the necessities of life and (2) support cannot be modified retroactively.

Concerning the intent that support is to provide the necessities of life, the court wrote: "The marital duty of a husband to support his wife is not suspended during the continuance of the marriage because the wife may be indebted to him. The obligation to pay alimony is founded on this duty, and is not an ordinary debt. Where the interlocutory decree is silent, as in the case herein, as to an indebtedness of the wife to the husband, he may not as a matter of right offset his obligation to pay monthly alimony against the wife's debt to him, and thus relieve himself from making provision for her support." (*Keck, supra,* 219 Cal. at pp. 319-320.)

Concerning the rule that support cannot be modified retroactively, the court wrote: "A subsequent order which relieves the husband from paying accrued alimony in cash as ordered, and discharges said alimony by offsetting it against an indebtedness of the wife to the husband existing at the time of entry of the divorce decree is a modification as to past due installments, just as is an order requiring the wife to accept in full settlement of accrued alimony less than the full amount due." (*Keck, supra,* 219 Cal. at p. 321.)

6

*Keck* stands for the proposition that debts existing at the time the child or spousal support order was made cannot be used to offset the child or spousal support.  In other words, the supporting spouse must make child or spousal support payments to the supported spouse even though the supported spouse owed money to the supporting spouse before the court ordered the supporting spouse to pay support.

For much the same reasons, a supporting spouse cannot use a business loss incurred by the supporting spouse, for which the supported spouse shares liability, to offset child or spousal support, even if the supporting spouse incurs the shared loss after the trial court ordered support.  (*Williams, supra,* 8 Cal.App.3d 636.)

In *Williams*, the court ordered the husband to pay both alimony and child support to wife.  After support had been ordered, the husband and wife agreed that the husband would manage a jointly owned apartment house.  In managing the apartment house, the husband incurred a loss, so he deducted the wife's proportional share of the loss from her support payments.  (*Williams, supra,* 8 Cal.App.3d at pp. 638-639.)  Citing the reasoning in *Keck*, the Court of Appeal held that the husband could not use the business loss (which resulted in a debt owed by the wife to the husband) to offset his support obligations.  The court wrote:  "The rationale behind such rule is that alimony is not an ordinary debt but a marital duty of the husband to support his wife.  To allow such a setoff would amount to a retroactive alteration of alimony payments or debts . . . ."  (*Id*. at p. 639.)  The court applied the same rule to child support because it "is not an 'ordinary debt' but rather a court-imposed obligation to provided for one's child."  (*Ibid*.)

From *Keck* and *Williams*, we see that child and spousal support obligations are not ordinary debts to be offset by debts owed by the supported spouse.

B.    *Specific Dealings*

1.    Grissom Ranch Sale Proceeds

Michael and Sharon acquired Grissom Ranch from the bankruptcy estate, farmed it, then sold it.  Michael claims that funds Sharon received from the sale of Grissom

Ranch should have been credited to him in satisfaction of his arrearages. The trial court discussed Grissom Ranch in its statement of decision. We quote that discussion here as a starting point to Michael's contentions with respect to Grissom Ranch:

"Grissom Ranch was the only property acquired through the use of [Sharon's right of first refusal under bankruptcy laws[1]]. Grissom Ranch was sold in 2005 for $494,935, with $293,475 of that going to McCormick, Barstow [for legal fees], $61,439 for payment of California State taxes, and $240,000 going to [Sharon].

"The parties have differing testimony as to the scope of any agreements regarding Grissom. [Michael's] testimony is the parties agreed that he would farm the property, and they would sell the crop, split the cultural costs, and split the income. [Sharon] believed that the objective was for the parties to ultimately own the property together with [Michael's] cousins, Lance and Michelle Ioppini. [Sharon] denies that [Michael] farmed the Grissom Harvest and negotiated contracts so that she and the child would be supported in 2004.

"The Court declines to offset arrearages based on the Grissom Ranch transaction. Initially, any receipt of funds in 2008 goes beyond the scope of the arrearage period, which commenced on January 1, 2004. The Court's November 12, 2008 Statement of Decision gives 'the trial court the freedom to exercise its equitable duty to determine whether enforcement of the entire amount is appropriate in light of developments post January 1, 2004.' Consistent with that approach, and as to the 2003 crop proceeds, the Court sustained objections to evidence related to claimed child support paid prior to January 1, 2004, asking that a pattern of support be proven during the arrearage period.

---

[1] Section 363(i) of the Bankruptcy Code gives the nondebtor co-owner or spouse a right of first refusal to purchase the property of the estate in a sale by the bankruptcy trustee. (11 USC § 363(i).)

"Moreover, [Michael's] argument that these Grissom expenditures were intended as a substitute for support is flawed. [Michael] testified that he sent [Sharon] an invoice for the cultural costs, wrote those off as a business expense, and seeks reimbursement for half of the Grissom sale. It appears that [Michael] considered the Grissom transaction [a] business venture or investment and it is not in the character of a support payment.

"Moreover, the written contract regarding Grissom does not discuss the issue of repayment of cultural costs or the Grissom sales proceeds. [Sharon's] Exhibit '85' was an agreement [Sharon] entered into regarding the purchase of Grissom Ranch, with [L]ance and Michelle Ioppini. [Michael] was not a party to that contract. Similarly, Exhibit 'FF,' written by [Michael], makes specific reference to whether [Sharon] would receive a right to buy back the property should Mr. Ioppini decide to sell, but made no mention of any reimbursement issues. Thus, the documents prepared at the time of the farming and sale of Grissom do not support [Michael's] position." (Citations to record omitted.)

Michael claims that it was undisputed that he was entitled to 50 percent of the proceeds received by Sharon for the sale of Grissom Ranch. He acknowledges that legal fees were paid to McCormick, Barstow out of the Grissom Ranch sale proceeds, but he argues that those fees amounted to $170,000 (not $293,475, as found by the trial court) and that Sharon was responsible for half of those legal fees (not that the parties agreed Michael would pay all legal fees, a dispute which the trial court did not expressly settle). Using his own evidence about the amount of legal fees paid to McCormick, Barstow ($170,000) and concluding that Sharon was responsible for half of those fees, Michael claims he was entitled to a credit from Sharon of $162,967. In the alternative, he argues that if he was responsible for all legal fees, he is still entitled to a credit of $77,467 from the proceeds of the Grissom Ranch sale. Michael argues that amount should be credited to the amount he owes in arrearages.

9

Michael contends that he is entitled to an offset for his part of the Grissom Ranch sale proceeds because, even though the money came from a business dealing between Sharon and him, *Williams* does not apply because Sharon retained the money. We conclude that we need not resolve this apparently novel legal issue because, even if it is resolved in Michael's favor, he is not entitled to any of the proceeds of the Grissom Ranch sale.

We recognize that the facts of the Grissom Ranch sale differ from the facts in *Williams*, which holds that support arrearages are not to be offset by business debt owed to the supporting spouse by the supported spouse. In *Williams*, the supporting spouse incurred a business loss attributable to both spouses. Here, on the other hand, there was a business gain (it is unclear from the record whether it was an actual profit) as a result of the sale of the property. In her testimony, Sharon acknowledged that there was an agreement between her and Michael that they would each receive 50 percent of the proceeds of the Grissom Ranch sale.

In the statement of decision, the trial court noted the factual dispute between the parties concerning who would pay legal fees for their property transactions. The court wrote: "[Michael] testified that the parties had an oral agreement in 2003, whereby [Sharon] would pay him back for various expenses that he incurred, including attorneys' fees. [Sharon] denied this. She testified that, per [Michael] he would pay all the legal fees if they tried to acquire assets out of the bankruptcy estates. [Sharon's] position is that she never would have agreed to pay the attorneys' fees, as she could not have afforded that." (Citations to record omitted.) Having noted the factual dispute, the court "set[] [it] aside," rather than resolving it.

Even though the trial court made no express finding concerning whether the parties agreed that Michael would pay all legal fees, we must presume the trial court credited the evidence that there was such an agreement. Michael makes no effort to establish that he objected to the statement of decision on this basis (that the trial court

10

failed to resolve the credibility issue), so our only role is to determine whether there is substantial evidence that the parties agreed that Michael would pay all legal fees.

If the trial court's statement of decision omits material factual findings, a reviewing court is required to infer any factual findings necessary to support the judgment if there is substantial evidence to support the findings. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) An exception to this rule occurs when the appellant brought the omission in the statement of decision to the trial court's attention and asked that the factual question be resolved. (Code Civ. Proc., § 634.) Here, Michael's appellate briefing does not attempt to show that he objected to the trial court's failure to resolve the credibility issue concerning who would pay legal fees associated with the Grissom Ranch sale. We therefore turn to the record to determine whether there is substantial evidence to support a finding that the parties agreed that Michael would pay the legal fees. As noted above, Sharon testified to that agreement, saying that Michael agreed to pay all legal fees, so we must review Michael's contentions on appeal within the backdrop of the parties' agreement that Michael would pay all legal fees associated with the Grissom Ranch sale.

According to the statement of decision, Grissom Ranch was sold for $494,935. Of that, $293,475 went to McCormick, Barstow for legal fees, and $61,439 were paid in California taxes. The statement of decision reflects that Sharon was then left with $240,000. The math does not work with these numbers. The legal fees plus the state taxes plus what Sharon received adds up to about $100,000 more than the $494,935 sale price of Grissom Ranch. Neither party attempts to explain this apparent discrepancy. In fact, Michael ignores the trial court's finding as to the amount of legal fees and, instead, claims that it was $170,000 (which amount also does not work to make the numbers add up properly). If the trial court was correct (and we must presume it was because neither party claims that substantial evidence does not support the court's finding), then more

than half of the Grissom Ranch sale proceeds were consumed by legal fees.[2]  Since Michael was responsible for those fees, he cannot now complain that he did not get his half.

>    2.      Grissom Ranch Crop Proceeds

Michael contends the trial court abused its discretion with respect to payments Michael made to Sharon from the proceeds Michael received in November and December 2003 from that year's grape crop at Grissom Ranch.  He claims those were given to Sharon as prepaid child and spousal support.  We conclude the contention is without merit.

A court has discretion to apply past overpayment of child and spousal support toward later support arrearages.  (*In re Marriage of Peet* (1978) 84 Cal.App.3d 974, 980 (*Peet*).)  Normally, however, the prior overpayment is considered a gift.  "Very seldom will a situation arise in which a trial court will find that, absent at least communication, a gift was not intended by the overpayment.  Absent communication or agreement, the situation is inherently suspect.  '[Credit] . . . should not be permitted easily.'  [Citation.]" (*Ibid.*)

In *Peet*, the father was ordered to pay support to the mother in 1959.  For a period of more than 10 nonconsecutive years, the father overpaid child support.  However, from August 1971 to April 1975 the father did not pay support.  The mother obtained a writ of execution for the amount of unpaid child.  On the father's motion to quash the writ, the trial court credited him for the overpayment, thus reducing the net arrearage.  (*Peet, supra*, 84 Cal.App.3d at pp. 976-977.)  The Court of Appeal affirmed.  It held that whether a supporting spouse is entitled to a credit is a matter for the sound discretion of

---

**2**      Our review of the record shows that the legal fees paid to McCormick, Barstow may have been $193,475.17, but that is not what the trial court found.  And the parties do not dispute what the trial court wrote in the statement of decision.

the trial court, to be determined based on equitable factors.  The court found that the equities favored giving the credit to the father because (1) the father actually paid the extra support, (2) the failure to pay support later, when it was due, did not cause a hardship for the mother, and (3) the support obligation had ended before the mother sought the arrearages.  (*Id*. at pp. 976, 980-981.)

During trial, Michael attempted to introduce evidence concerning Grissom Ranch crop proceeds from 2003.  Michael's attorney made an offer of proof concerning the evidence.  She said that, because Michael's income was seasonal, Michael prepaid 2004 support to Sharon in November and December 2003 from the proceeds related to the 2003 Grissom Ranch crop.  Sharon objected to the evidence, and the trial court said that it would allow only a "very simple statement" concerning what Michael paid Sharon in 2003.

Michael's attorney questioned Michael's expert accountant in this regard.  The accountant testified that Michael paid Sharon $242,480 in installments in November and December 2003.  The money came from the sale of grapes harvested on Grissom Ranch.  Later, in 2004 and 2006, Michael paid to third parties a total of $134,000 in farming expenses, including cultural costs, related to the 2003 Grissom Ranch crop.

According to Michael, the parties' agreement concerning Grissom Ranch was to "farm it, sell the crop, split the cultural costs, and split the income."  When the 2003 crop proceeds became available, Michael gave them to Sharon.  Michael claimed that he told her not to worry about the expenses incurred to produce the crop.  He would cover the expenses, and they could settle up later.  Even as the support arrearages began to accrue in January 2004, Michael sent Sharon a bill for the cultural costs relating to the 2003 Grissom Ranch crop because he considered it a business debt owed to him by Sharon.

In the statement of decision, the court noted that it had "sustained objections to evidence related to claimed child support paid prior to January 1, 2004."  However, as noted above, the court continued:  "[Michael's] argument that these Grissom

13

expenditures were intended as a substitute for support is flawed. [Michael] testified that he sent [Sharon] an invoice for the cultural costs, wrote those off as a business expense, and seeks reimbursement for half of the Grissom sale. It appears that [Michael] considered the Grissom transaction [a] business venture or investment and it is not in the character of a support payment. [¶] Moreover, the written contract regarding Grissom does not discuss the issue of repayment of cultural costs or the Grissom sales proceeds. [An exhibit] was an agreement [Sharon] entered into regarding the purchase of Grissom Ranch, with [L]ance and Michelle Ioppini. [Michael] was not a party to that contract. Similarly, [another exhibit], written by [Michael], makes specific reference to whether [Sharon] would receive a right to buy back the property should Mr. Ioppini decide to sell, but made no mention of any reimbursement issues. Thus, the documents prepared at the time of the farming and sale of Grissom do not support [Michael's] position." (Citations to record omitted.)

On appeal, Michael contends that the trial court "abused its discretion when it refused to even consider a credit for the Grissom 2003 crop payment that Sharon retained against the support arrears owed from 2004 forward." This contention is without merit because, even though the trial court ruled that such evidence was inadmissible, it ultimately admitted evidence relating to the 2003 Grissom Ranch crop proceeds and found that what Michael claimed was prepayment of support was really just a business dealing that gave rise to a business debt owed from Sharon to Michael.

The trial court was correct, even in light of *Peet*, which held that a supporting spouse may be entitled to a credit for prior overpayment of support. Here, Michael may have overpaid to Sharon her portion of the 2003 Grissom Ranch crop proceeds in November and December 2003, but those payments were, according to Michael, subject to the understanding that they would settle up later. In other words, it was a business dealing that resulted in a business debt. It was not, in reality, prepayment of child and spousal support that began accruing in January 2004.

14

Under *Keck* and *Williams*, the trial court was not compelled to consider this business debt, created before the commencement of the support period, as a prepayment of support that was to begin in 2004. The court did not abuse its discretion because, even though money was paid to Sharon, she was, according to Michael, under an obligation to repay him some of the money to "settle up" their business dealing. If those November and December 2003 payments to Sharon had been prepayment of child and spousal support, Sharon would have been under no obligation to repay Michael. Nonetheless, Michael sent Sharon a bill for the cultural costs, proving the business nature of the payments.

Michael's contention that the trial court refused to consider a support credit for the 2003 Grissom Ranch crop proceeds paid to Sharon is without merit simply because the trial court considered and rejected the proposition. And the record supports the trial court's exercise of discretion in rejecting it.

        3.      $85,510

During the period of mounting arrearages, Michael gave Sharon a total of $85,510 in five payments. Michael testified that he made the payments at Sharon's request for money to pay living expenses. Sharon, however, testified that Michael did not make any support payments during the arrearages period, even though he assisted the children directly on occasion, such as to contribute money to help lease a car for one of the children or to pay for a portion of their son's braces. She said that payments made to her were for their business dealings.

The evidence concerning the payments is sparse, beyond the fact that they were made. As to one payment, Michael testified that he paid Sharon $15,000 in response to a letter (introduced as an exhibit) from her asking for $13,474.05 to pay some bills. However, he admitted that, on the front of the check for $15,000, he wrote "harvest advance."

15

In its statement of decision, the trial court ruled that these payments totaling $85,510 from Michael to Sharon did not offset Michael's child and spousal support obligations because they were for business dealings.

Michael asserts that there is insufficient evidence in the record to support the trial court's finding with respect to the $85,510 in payments he made to Sharon. To the contrary, the evidence was sufficient.

We apply the substantial evidence standard of review. " 'Substantial evidence means evidence which is of ponderable legal significance – evidence which is reasonable in nature, credible and of solid value. [Citation.]' (*Horn v. Oh* (1983) 147 Cal.App.3d 1094, 1099.) 'In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]" [Citation.]' (*Estate of Young* (2008) 160 Cal.App.4th 62, 75-76.) 'We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment. [Citation.]' (*Id.* at p. 76.) The testimony of a single witness may be sufficient to constitute substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)" (*Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 969.)

Here, there was evidence that the parties engaged in business dealings and Sharon testified that all of the payments Michael made to her were connected to those business dealings. That was sufficient to support the trial court's finding. In addition to that substantial evidence, Michael wrote on the check that at least one of the payments to Sharon was a "harvest advance." So the evidence was sufficient to conclude that the payments made by Michael to Sharon were connected to their business dealings and were not given to her as child or spousal support. Michael cannot claim that the same payments that satisfied his business obligations also satisfied his court-ordered support obligations.

16

II

*Equitable Estoppel*

Michael contends the trial court erred by finding that Sharon is not equitably estopped from claiming child and spousal support arrearages. He claims she induced him to believe he was not obligated to pay support. We conclude the trial court did not err because the record supports its finding that Michael had knowledge of the true facts – that is, that he was obligated to pay support – which is fatal to his estoppel claim.

" 'The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment. The elements of the doctrine are that (1) the party to be estopped [here, Sharon] must be apprised of the facts; (2) [she] must intend that [her] conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party [here, Michael] must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. [Citation.]' [Citations.]" (*City of Goleta v. Superior Court* (2006) 40 Cal.4th 270, 279.) " 'Where one of the elements is missing, there can be no estoppel. [Citations.] The doctrine acts defensively only. It operates to prevent one from taking unfair advantage of another but not to give an unfair advantage to one seeking to invoke the doctrine. [Citation.]' [Citation.]" (*In re Marriage of Brinkman* (2003) 111 Cal.App.4th 1281, 1289-1290.)

In general, "[t]he existence of an estoppel is a factual question," and thus the trial court's ruling is reviewed under the substantial evidence standard of review. (*J. H. McKnight Ranch, Inc. v. Franchise Tax Bd.* (2003) 110 Cal.App.4th 978, 991.) "When, however, the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law and the reviewing court is not bound by the trial court's ruling. [Citations.]" (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 319.)

17

Here, Michael claims the facts are undisputed, so the application of equitable estoppel is a question of law. To the contrary, as we discuss below, the trial court found as a fact that Michael knew that he was obligated to pay support. If that fact is undisputed, Michael loses. But we must determine whether that factual finding was supported by substantial evidence. We conclude it was.

The trial court reviewed the parties' transactions with respect to nine of the bankruptcy properties and found that none of those transactions justified a finding that Sharon should be equitably estopped from claiming support arrearages. We need not recount those findings, however, because the trial court also found that Michael knew he was obligated to pay the child and spousal support, which negates an essential element of estoppel.

Concerning Michael's knowledge of the support obligation, the court found:

"As indicated above, one of the elements of [] equitable estoppel is that the other party was genuinely ignorant of the true facts. [Citation.] In this case, [Michael] asserts that he did not know that his support obligations commenced on January 1, 2004. However, the Court notes that on December 9, 2002, the parties agreed that '[Michael] and [Sharon] shall suspend all family law issued until December 31, 2003.' [Record citation.] Prior to December 9, 2002, there was an order in place for $4,000 [*sic*] per month in child support and $2,000 in spousal support. [Record citation.] In the November 2008 Statement of Decision, the Court found that there was no ambiguity in this language and the express statement, and intention of the parties, was that support would resume on January 1, 2004:

" 'The Court finds that the intention of the parties in entering the Compromise Agreement on January 9, 2004, was to merely suspend litigation of the issues pending the bankruptcy. That was the express intention and the only practical application. Any other interpretation would inure solely to [Michael's] benefit and would not make sense from [Sharon's] standpoint, and would be a violation of public policy.' [Record citation.]

"Therefore, the Court finds that [Michael] knew or should have known of the existence of the support order as of January 1, 2004. Where one of the elements is missing there can be no estoppel. [Citation.]"

On appeal, Michael attempts to challenge this finding by the trial court by arguing that Sharon engaged in conduct after January 1, 2004, that led him to believe that he no longer owed support. Examples of this conduct include Sharon's transacting business with Michael and profiting from it, while failing to demand support payments.

We find this argument unconvincing. The court found that Michael knew on January 1, 2004, that he was obligated to pay support. While the court did not expressly find that Michael continued to know about his support obligations after that date, it is implied in the court's rejection of the equitable estoppel argument. Nothing in Sharon's conduct after January 1, 2004, requires a finding, as a matter of law, that Michael's knowledge of his support obligation changed. Thus, the record, considered in the light most favorable to the order, supports the finding that Michael knew, throughout the period of accruing arrearages, that he was obligated to pay.

In addition to the finding the Michael knew he was obligated to pay child and spousal support after January 1, 2004, the court found that the many transactions between Michael and Sharon were business dealings, not in the nature of support. Having found they were business dealings, the court concluded that any money owed by Sharon to Michael was a business debt, as noted above, and equity would not estop Sharon from collecting the arrearages. This is borne out by Michael's separate lawsuit seeking damages from Sharon as a result of the many transactions. Michael cannot (1) make the inconsistent claim that those transactions satisfied his support obligations but that Sharon is liable to him for damages and (2) benefit from an equitable argument in this case. The equities do not favor him.

Michael's contention that the trial court abused its discretion in rejecting his equitable estoppel argument is without merit.

19

III

*Family Code section 271 Attorney Fees*

In her appeal, Sharon contends that the trial court abused its discretion by not awarding her more attorney fees under Family Code section 271 (section 271).  We conclude the trial court properly considered the appropriate factors and did not abuse its discretion in determining the amount of attorney fees to award Sharon.

As relevant to this contention, section 271, subdivision (a) provides: "Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys.  An award of attorney's fees and costs pursuant to this section is in the nature of a sanction."

"[A] motion for attorney fees and costs in a dissolution proceeding is left to the sound discretion of the trial court.  [Citations.]  In the absence of a clear showing of abuse, its determination will not be disturbed on appeal.  [Citations.]  '[The] trial court's order will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order made.  [Citations.]' [Citation.]"  (*In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 768-769; see also *In re Marriage of Burgard* (1999) 72 Cal.App.4th 74, 82 [imposition of sanction under section 271 reviewed under abuse of discretion standard].)  "The burden is on the complaining party to establish abuse of discretion.  [Citations.]"  (*In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 682.)

Citing Michael's conduct that she alleges caused the litigation to be prolonged and expensive, Sharon requested an award of section 271 attorney fees.  There was some evidence that her fees for this family law case and the civil litigation with Michael, combined, were more than $300,000.  But Sharon does not cite to the record where she

made clear to the court how much she was requesting under section 271. In her proposed statement of decision, she asked for an award of section 271 attorney fees as set forth in a fee schedule "to be submitted."

Michael, for his part, requested an award of $323,983 in section 271 attorney fees as a sanction for dilatory and unjustified conduct.

The trial court rendered its opinion concerning the requests for attorney fees under section 271 in its statement of decision as follows:

"Each party seeks attorneys fees citing the other[']s behavior throughout this litigation. The court finds the issue of section 271 fees problematic because neither party was completely forthright in their dealings with each other in this case and both made the case more complicated and expensive by failing to respond to reasonable discovery requests at various times in the case. Some of these have been addressed by an award of fees pursuant to the Discovery Referee's recommendations in this case. There are many examples the court could cite, but just some examples include [Sharon's] objections to a Demand for Production of Documents after the time for objections had expired and [Michael's] providing boxes with thousands of documents in response to a production request and requiring [Sharon] to review them all at his attorney's office within a very limited timeframe. There is a list of inappropriate behavior on both sides that offset one another in regards to a request for 271 sanctions.

"However, there is one particular issue that the court found particularly grievous that does warrant sanctions. That is [Michael's] attempt to disqualify [Sharon's] attorney practically on the eve of trial. At the time of the hearing on that motion, the court stated that [Michael's] position was disingenuous. For that motion the court is awarding sanctions in favor of [Sharon] in the sum of $4,130."

The trial court denied the bulk of Sharon's requested section 271 attorney fees because she too was guilty of sanctionable conduct, not because Michael was free of such conduct. Indeed, if the parties were equally (or even somewhat equally) guilty of using

21

tactics that prolonged the litigation and drove up fees, the trial court was justified in denying (or greatly reducing) the request for section 271 attorney fees. It is reasonable in the exercise of its broad discretion for a court to refuse to sanction either party with an award of attorney fees when both parties are culpable. Because it is reasonable, such a decision is not an abuse of discretion. (See *In re Marriage of Sullivan, supra,* 37 Cal.3d at pp. 768-769 [relating to analogous attorney fee request].)

But Sharon, in her brief on appeal, complains that the trial court's statement of decision was inaccurate. She recognizes that the court specified one instance of dilatory conduct on her part – "objections to a Demand for Production of Documents after the time for objections had expired." At the same time, without even discussing the basis of that specific finding by the trial court, she claims that the record does not support the finding that she engaged in dilatory conduct. Finally, Sharon presents a list of Michael's actions meriting sanctions and concludes that we must reverse the award of section 271 attorney fees and remand for an award of all the fees she requested.

In support of her contention, Sharon cites to *Tharp v. Tharp* (2010) 188 Cal.App.4th 1295 (*Tharp*). In *Tharp*, the trial court denied the wife's motion for section 271 attorney fees because both parties had engaged in dilatory conduct. But the Court of Appeal found that the record did not support a finding that the wife had committed sanctionable conduct, while the husband's "antics . . . clearly demonstrate[d] that sanctions under section 271 were warranted." (*Id*. at p. 1318.) On this basis, the *Tharp* court reversed on the matter of section 271 attorney fees. (*Id*. at p. 1328.)

Here, unlike in *Tharp*, Sharon engaged in sanctionable conduct. As the trial court noted, she objected to discovery demands long after the time for objecting had expired. Instead of discussing the basis of the trial court's finding that she objected to discovery long after the time to object had expired, Sharon simply declares that "the record does not support the court's conclusion that Sharon is in any way responsible for delays or increased costs in the proceedings." Simply denying wrongdoing in the face of a trial

22

court finding of at least one instance of wrongdoing fails to support a contention that the record does not support the trial court's order.

Therefore, unlike the wife in *Tharp*, Sharon is not without blame and cannot contend that the trial court was without cause for finding that she was at fault, at least in part, for the length of the proceedings and the expenses incurred. Sharon has failed to establish that the trial court abused its discretion by not awarding her any more than $4,130 in attorney fees under section 271.

## DISPOSITION

The order is affirmed. The parties must bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)


                                                            NICHOLSON          , J.


We concur:


      RAYE            , P. J.


      BLEASE         , J.


23