Filed 8/27/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JEFFREY PRANG, as County Assessor, etc., | B301194 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS173434) |
| v. | |
| LOS ANGELES COUNTY ASSESSMENT APPEALS BOARD NO. 2, | |
| Defendant and Respondent; | |
| DOWNEY LANDING SPE, LLC, | |
| Real Party in Interest and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge. Affirmed.

Everett L. Skillman, for Real Party in Interest and Appellant.

Ajalat, Polley, Ayoob & Matarese, Richard J. Ayoob, Christopher J. Matarese, and Gregory R. Broege as Amicus Curiae on behalf of Real Party in Interest and Appellant.

Lamb and Kawakami, Michael K. Slattery and Thomas G. Kelch, and Mary Wickham, County Counsel, Richard Girgado, Deputy County Counsel, and Justin Y. Kim, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

When a county reassesses real property within its boundaries based on a triggering event that occurred at some point prior to the current "assessment year," the county assessor has the authority—and a constitutional duty—to levy retroactive assessments to recapture any under-taxation in the prior years that would otherwise escape taxation due to the delay between the triggering event and the reassessment.  (Rev. & Tax. Code, §§ 51.5, subd. (d), 531, 531.2; *Trailer Train Co. v. State Bd. of Equalization* (1986) 180 Cal.App.3d 565, 580 (*Trailer Train*).)[1] Although our Legislature placed statutory caps on how many years' worth of escape assessments an assessor may seek to levy (§ 532, subds. (a), (b)(1), (b)(2)), it also enacted section 532, subdivision (b)(3) that eliminates any cap and authorizes escape assessments for each year back to the "year in which the property escaped taxation" if "[the] property . . . escaped taxation" due to a "change in ownership" of a legal entity and the taxpayer acquiring the legal entity did not file with the State Board of Equalization (the State Board) a "change in ownership statement" mandated by section 480.1.  (§§ 532, subd. (b)(3),

<hr>

[1]    All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

480.1, subds. (a) & (b).) This case presents the question: Is the filing requirement set forth in section 480.1 satisfied—and, thus, may an assessor no longer levy escape assessments back to the year of the change in ownership pursuant to section 532, subdivision (b)(3)—when the taxpayer acquiring the legal entity recorded a document with less than all the information required by section 480.1 (namely, a Certificate of Merger certified by another state) in the wrong place (namely, the county recorder's office)? We conclude that the answer is "no" because taxpayers must strictly comply with those aspects of the notice requirements of section 480.1. Accordingly, we affirm the trial court's issuance of a writ of administrative mandamus.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

The property at issue in this case is the Downey Landing Shopping Center on Lakewood Boulevard in the city of Downey (the Property). The Property has 376,645 square feet of "leasable improvement area" and this area was leased to a number of retailers, including (as of 2009) Old Navy, Pier 1 Imports, Bally Total Fitness and Bed Bath and Beyond. Prior to May 2006, the landlord and owner of the Property was Downey Landing, LLC (Downey).

In May 2006, Downey merged with Downey Landing SPE, LLC (Downey SPE). This merger was ultimately determined to have effected a "change in ownership," which triggers a reassessment of the base value of the Property now owned by Downey SPE.

A few days after the merger, Downey SPE filed a copy of the Certificate of Merger (the Certificate), certified by the State of Delaware, with the Los Angeles County Recorder's Office. The

3

Certificate is silent as to whether either entity owns property in California. Downey SPE did not file anything with the State Board.

In 2009, some of the leases on the Property were renewed and the Los Angeles County Assessor's Office (the Assessor) evaluated whether to reassess the base value of those leasehold interests. (§ 104, subd. (a) ["real property" "includes" "possess[ory]" interests]; *Seibold v. County of Los Angeles* (2015) 240 Cal.App.4th 674, 681-682 [possessory interests are taxable].) On a "Possessory Interest Appraisal Worksheet," the Assessor noted that the "Less[or]" had changed from "Downey Landing, LLC" to "Downey Landing SPE, LLC"; the "Remarks" section of the worksheet also noted, among other things, that "Region 28 is assessing the other portion of the Shopping Center." The Assessor did not at that time reassess the base value of any *ownership interest* in the Property.

In May 2013, Downey SPE filed a Form BOE-100-B with the State Board. The Form BOE-100-B is the standardized form taxpayers acquiring legal entities may file to satisfy the requirements of section 480.1. Downey SPE's form listed all of the parcels (and assessment numbers) for the Property.

In April and August 2015, respectively, the Assessor sent Downey SPE Notices of Assessed Value Change and Adjusted Property Tax Bills for each of the parcels comprising the Property.[2] Through these documents, the Assessor (1) reassessed

---

2      The notices and bills were addressed to Downey, and it was Downey—not Downey SPE—that filed an administrative appeal, was named the real party in interest in the writ proceedings, and is the named appellant here. However, we refer to Downey SPE

4

the base value of the parcels, as of 2006, for use on a going-forward basis, and (2) demanded payment of "escape assessments" reflecting the amount of property taxes that would have been collected on each parcel had the parcels been reassessed back in 2006, which corresponds with the 2007-2008 fiscal year. The total of the escape assessments came to $16,014,000.

## II.    Procedural Background

### A.    *Administrative proceedings*

Downey SPE filed an appeal to the Los Angeles County Assessment Appeals Board to challenge the amount of the escape assessment. Specifically, Downey SPE argued that the Assessor could collect escape assessments for only the four years prior to the reassessment (that is, for the 2011-2012, 2012-2013, 2013-2014 and 2014-2015 fiscal years); assessments for earlier years, Downey SPE urged, were barred by a four-year limitations period. According to Downey SPE, the total permissible escape assessments came to $8,607,147.

The Assessment Appeals Board, Board No. 2 (the agency) sided with Downey SPE. In a written ruling issued in October 2017, the agency ruled that the Assessor was bound by the four-year limitations period generally applicable to escape assessments. The agency also ruled that the Assessor could not collect escape assessments all the way back to the 2007-2008 fiscal year under section 532, subdivision (b)(3) because (1) the Certificate recorded by Downey SPE "was the equivalent of [a] BOE-100-B filing," such that the prerequisite for the Assessor's reliance on section 532, subdivision (b)(3)—that is, the failure to

herein because it is the pertinent taxpayer following the change in ownership via merger.

5

file a "change in ownership statement" with the State Board under section 480.1—was missing, and (2) the Assessor also "had actual and constructive notice of [the] change in control/ownership in 2009," as reflected in the Possessory Interest Appraisal Worksheet and in conversations between Downey SPE and the Assessor's office.

## B. *Writ proceedings*

The Assessor filed a petition for a writ of administrative mandate challenging the agency's ruling.

Following briefing on the merits, the trial court overturned the agency's ruling. The court ruled that section 532, subdivision (b)(3) applied and authorized escape assessments reaching back to the 2007-2008 fiscal year.

The court cited two reasons for its ruling. First, the court determined that section 480.1's express requirement that a "change in ownership statement" be filed with the State Board was to be strictly enforced. Strict compliance is warranted, the trial court reasoned, because (1) strict compliance is consistent with the Legislature's "very specific" and "detailed" instructions "about who was to receive the notice, where the notice was to be filed and what the notice must say," and (2) strict compliance facilitates "[t]he legislative scheme" that "makes the [State Board] the repository of entity change of control information" and then entrusts the State Board with "determin[ing] whether an entity's change of control—sometimes a complex transaction—results in a change of ownership of real property subject to reassessment" and, if reassessment is appropriate in any given case, "notif[ying] county assessors through an advisory letter." Here, Downey SPE had not strictly complied with the statutory notice procedures. Second, and in the alternative, the court

6

determined that even if substantial compliance were enough, it was lacking here because the Certificate did not advise the Assessor "whether and to what extent, if any, [Downey SPE] owned real property in the County."

###### C. *Appeal*

Downey SPE filed a timely notice of appeal.

## DISCUSSION

Downey SPE argues that the trial court erred in granting the petition for a writ of mandate allowing the Assessor to levy more than four years' worth of escape assessments.[3]  Because a writ of mandate seeking review of an administrative agency's determination is appropriately granted when the agency has "prejudicial[ly] abuse[d] [its] discretion" (Code Civ. Proc., § 1094.5, subds. (a) & (b)), whether the writ should have been granted in this case boils down to two interlocking questions:  (1) Whether the agency properly determined that the prerequisites for the Assessor to levy retroactive escape assessments under section 532, subdivision (b)(3) were not met, which hinges on (2) Whether the agency properly determined that Downey SPE had met section 480.1's filing requirements.  Because these questions entail questions of statutory interpretation as applied to the agency's amply supported factual findings (that are not challenged on appeal) and because this case does not involve or substantially affect a "fundamental, vested right," we stand in the shoes of the trial court and review the agency's answers to

---

[3]      Ajalat, Polley, Ayoob & Matarese (amicus), a California tax law firm, applied to file an amicus curiae brief in support of Downey SPE.  We granted the application, and provided the Assessor with an opportunity to respond to the amicus's arguments.

7

these questions de novo. (*Id.*, subd. (b); *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143-144; *TG Oceanside, L.P. v. City of Oceanside* (2007) 156 Cal.App.4th 1355, 1370-1371; see also *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 225 [questions of statutory interpretation reviewed de novo].)

## I. Are Section 532, Subdivision (b)(3)'s Prerequisites Satisfied?

### A. *The pertinent law*[4]

The assessors in each of California's 58 counties have the authority—and duty—to levy taxes on all of the property within their boundaries. (Cal. Const., art. XIII A, § 1(a); § 401.) The amount of the levy is the property's assessed value (referred to as its "full cash value") multiplied by the applicable, one-percent tax rate. (*Ibid.*; § 401.3; *Title Ins. & Trust Co. v. County of Riverside* (1989) 48 Cal.3d 84, 88 (*Title Ins.*).)

When Proposition 13 became law in 1978, the assessed value of real property was redefined as (1) either (a) the value of the property reflected on its "1975-[19]76 tax bill" or, if certain events triggering reassessment occur, (b) the "appraised value of [the] real property" at the time of the triggering event, plus (2) an "inflationary rate not to exceed 2 percent for any given year" keyed to the "consumer price index or comparable data." (Cal. Const., art. XIII A, § 2, subds. (a) & (b); §§ 110.1, 110.)

Although, in theory, county assessors will discover triggering events and reassess the property in the same "assessment" year that the triggering event occurred, there is

---

4     Because we must apply the law in effect when property taxes are due (*Texas Co. v. County of Los Angeles* (1959) 52 Cal.2d 55, 66; *Trailer Train, supra*, 180 Cal.App.3d at p. 577, fn. 8), we are setting forth the law in effect in 2015 (which, in pertinent part, is still in effect today).

sometimes a delay between the event and its discovery. When that happens, the question arises: Can the assessor levy retroactive escape assessments to collect any underpayment during the assessment years *in between*? The answer to that question ends up turning on two considerations. First, and as a threshold matter, reassessment of the property (which will define the property's value on a going-forward basis in future tax years) must be appropriate. If the assessor is not empowered to reassess the property at all, he or she has no basis to seek escape reassessments. Second, and if reassessment is appropriate, the assessor must have the power to levy escape assessments on a retroactive basis.

### 1. *When reassessment is appropriate*

Whether an assessor has the authority to reassess the value of property and thereby fix a new value on a going-forward basis turns on two considerations: (1) Has there been a qualifying triggering event, and (2) Is the reassessment timely?

### a. Qualifying triggering events

Since the passage of Proposition 13, an assessor may reassess real property only if one of three triggering events has occurred—namely, (1) when the property has been "purchased," (2) when the property is "newly constructed," or (3) when "a change in ownership has occurred." (Cal. Const., art XIII A, § 2, subd. (a); § 110.1; *926 North Ardmore Ave. LLC v. County of Los Angeles* (2017) 3 Cal.5th 319, 326 (*926 North Ardmore*) ["[a] change in ownership triggers reappraisal and reassessment for property tax purposes"]; *Osco Drug, Inc. v. County of Orange* (1990) 221 Cal.App.3d 189, 192; *Sav-On Drugs v. County of Orange* (1987) 190 Cal.App.3d 1611, 1615.).

9

Because legal entities (such as corporations, partnerships, limited liability companies and the like) can own property, our Legislature has also specifically defined when a change in ownership of such entities also constitutes a change in the ownership of property held by those entities. (See, e.g., § 64.) Without such definitions, legal entities might be able to "avoid reassessment" (and the often higher property taxes that come with it) by transferring property through the strategic use of corporate takeovers and mergers, thereby upsetting the "parity" and "equalization of the tax burden between individual and corporate purchasers of real property." (*Title Ins.*, *supra*, 48 Cal.3d at pp. 95-96.)

### b. Timeliness of reassessment

Even if a qualifying triggering event has occurred, reassessment is appropriate only if it is also *timely*. Whether a reassessment is timely depends upon the *reason* for the reassessment. If an assessor is seeking to reassess the property because he or she made an error in valuing the property during a prior assessment—that is, if the assessor is seeking to reassess to fix an error "involv[ing] the exercise of [the] assessor's judgment as to value"— then the assessor must act "within four years" after the "assessment year for which the [allegedly incorrect] base year value was first established," unless the valuation error "result[ed] from the taxpayer's fraud, concealment, misrepresentation, or failure to" furnish required information. (§ 51.5, subds. (b) & (c); *Montgomery Ward & Co. v. County of Santa Clara* (1996) 47 Cal.App.4th 1122, 1130 (*Montgomery Ward*).) But if the assessor is seeking to reassess the property for reasons "not involv[ing] the exercise of [the] assessor's own judgment as to value," then there is no time limit and the

10

assessor may "correct" the error by reassessing the property "in any assessment year in which the error or omission is discovered." (§ 51.5, subd. (a); *Sunrise Retirement Villa v. Dear* (1997) 58 Cal.App.4th 948, 957, 960 (*Sunrise Retirement Villa*) ["section 51.5(a) errors are correctable at any time"]; *Montgomery Ward*, at p. 1129 ["there is no limitations period to revise the base year value"].) An assessor's "failure to set a new base year value upon a change of ownership" does not involve the exercise of the assessor's judgment as to value, and thus may be corrected through reassessment at any time. (*Kuperman v. San Diego County Assessment Appeals Bd. No. 1* (2006) 137 Cal.App.4th 918, 926 (*Kuperman*) [so holding]; see also, *Harmony Gold U.S.A., Inc. v. County of Los Angeles* (2019) 31 Cal.App.5th 820, 826 (*Harmony Gold*) ["Examples of nonjudgmental error include . . . incorrectly concluding a change of ownership took place."]; *Little v. Los Angeles County Assessment Appeals Bds.* (2007) 155 Cal.App.4th 915, 926 [same].)

> 2.  *When escape assessments are appropriate*

If, under the rules set forth above, reassessment is appropriate, then the assessor has "a constitutional [and a statutory] duty to levy retroactive assessments" "if [he or she] discovers property has 'escaped assessment.'" (*American Airlines, Inc. v. County of San Mateo* (1996) 12 Cal.4th 1110, 1127 (*American Airlines*); § 51.5, subd. (d) [authorizing "appropriate" "escape assessments" if reassessment is permitted]; *Harmony Gold*, *supra*, 31 Cal.App.5th at p. 833 [so noting]; *Trailer Train*, *supra*, 180 Cal.App.3d at p. 580 ["Both Constitution and statute *require* the [State] Board to levy the escape assessment."].) The duty to levy escape assessments springs from our Constitution's mandate that "*[a]ll* property . . . be taxed in proportion to its full

11

value" (Cal. Const., art. XIII, § 1, subd. (b), italics added), and this mandate obligates assessors "(1) to assess *all* property in [their] jurisdiction and (2) to do so *on a uniform basis*." (*Knoff v. City etc. of San Francisco* (1969) 1 Cal.App.3d 184, 195.) "If any property subject to taxation should escape assessment in any year," our Supreme Court explained in 1881, "the taxation for that year would not be equal and uniform, nor would all property in this State be taxed in proportion to its value, and the behest of the Constitution would not be obeyed." (*Biddle v. Oaks* (1881) 59 Cal. 94, 96 (*Biddle*).)

Our Legislature has nevertheless narrowed the breadth of this duty by enacting statutes that place limits on how many years' worth of retroactive escape assessments may be levied. The general rule limits an assessor to levying escape assessments "for the . . . four years" "preceding" the reassessment. (§ 532, subd. (a); *Blackwell Homes v. County of Santa Clara* (1991) 226 Cal.App.3d 1009, 1014, 1017.)[5] Section 532, subdivision (b)(3) is one of the exceptions to this four-year cap.

Section 532, subdivision (b)(3) provides:

---

[5] The statute requires that escape assessments "shall be made within four years after July 1 of the assessment year in which the property escaped taxation or was underassessed." (§ 532, subd. (a).) Because a property "'escape[s] taxation'" up until the year it is reassessed, this language erects a four-year limitations period running backwards from the "assessment year" when the property is reassessed. (*Blackwell Homes, supra*, 226 Cal.App.3d at p. 1017; see also *Montgomery Ward, supra*, 47 Cal.App.4th at p. 1136 ["there is a new assessment year each and every year while there is only one year when the base year value of a particular property is established"].)

"Notwithstanding paragraphs (1) and (2) [of subdivision (b)], *in the case where property has escaped taxation, in whole or in part, or has been underassessed, following a change in ownership or change in control and* either [(1)] the penalty provided for in Section 503 must be added or [(2)] *a change in ownership statement, as required by Section 480.1* or 480.2 *was not filed with respect to the event giving rise to the escape assessment or underassessment, an escape assessment shall be made for each year in which the property escaped taxation or was underassessed.*"

(§ 532, subd. (b)(3), italics added.)

As the italicized language makes clear, an assessor is entitled—and, indeed, *obligated*—to levy escape assessments for each year all the way back to the first year of underassessment where (1) there was a "change in ownership" (which should have triggered reassessment and for which reassessment on a going-forward basis was appropriate); (2) the property "escaped taxation or was underassessed" despite the change in ownership triggering reassessment; and (3) "a change in ownership statement, as required by Section 480.1 . . . was not filed with respect to" that triggering event.

**B.** *Analysis*

Applying this framework, every single one of the prerequisites for the escape assessments challenged by Downey SPE is not only satisfied, but is undisputedly so. It is undisputed that Downey SPE's acquisition of Downey effected a "change in ownership" that qualified the Property for reassessment. (Accord, *Kuperman, supra*, 137 Cal.App.4th at p. 926.) It is

13

undisputed that the Property was underassessed from fiscal year 2007-2008 through its reassessment in 2015. And it is undisputed that Downey SPE did not file a "change in ownership statement" with the State Board "as required by Section 480.1."[6] Thus, whether the agency properly determined that the Assessor could not rely on section 532, subdivision (b)(3) to levy escape assessments outside the generally applicable four-year cap turns, first and foremost, on whether section 480.1's filing requirement must be *strictly* complied with.[7]

Before turning to this question, however, Downey SPE and its amicus urge that we can avoid it altogether and offer four reasons why, in their view, the Assessor cannot rely upon section 532, subdivision (b)(3) at all. Most of these arguments were never raised below, but because most involve a "'pure[] . . . question[] of law'" (namely, statutory interpretation), we will consider them for the first time on appeal. (*Kramer v. Intuit Inc.* (2004) 121 Cal.App.4th 574, 578.)

First, Downey SPE argues section 532, subdivision (b)(3) applies only when section 532 would otherwise allow for eight years of escape assessments, and thus is inapplicable in this case. This argument rests on the following syllogism: Subdivision

---

[6] Although Downey SPE filed a section 480.1-compliant change of ownership statement in 2013, this was *years* beyond the 90-day due date. Throughout the administrative and writ proceedings, the parties have treated this late-filed statement as a nullity. We will do the same.

[7] Because, as we determine, strict compliance is required, we have no occasion to decide whether Downey SPE's recording of the Certificate at the County Recorder's Office constituted substantial compliance with section 480.1.

(b)(3) applies "[n]otwithstanding paragraphs (1) and (2) [of subdivision (b)];" this phrase means that subdivision (b)(3) operates *only* as an exception to subdivisions (b)(1) and (b)(2); subdivisions (b)(1) and (b)(2) by their terms do not apply here; and therefore, subdivision (b)(3) cannot apply.

We reject this reading of section 532. Our task is to interpret statutory language "'in the context of the statutory framework as a whole.'" (*People v. Murphy* (2001) 25 Cal.4th 136, 142.) Subdivision (a) of section 532 sets forth the generally applicable four-year cap on escape assessments, and subdivision (b) of section 532 goes on to define a series of cascading exceptions to that general rule. Subdivisions (b)(1) and (b)(2), respectively, set forth an eight-year reachback cap on escape assessments when the taxpayer has willfully failed to disclose information regarding the transfer of "tangible personal property to evade taxation" (§§ 532, subd. (b)(1), 504, 502) and when the taxpayer has not filed a "deed or other document evidencing a change in ownership" "with the county recorder's office" as required by sections 480 or 480.3 (§ 532, subd. (b)(2)). Subdivision (b)(3) allows for an *unlimited* reachback period when, as pertinent here, a person or entity acquiring a legal entity has not filed the required "change in ownership statement" with the State Board, and this unlimited period trumps *any and all* shorter limitation periods, including the eight-year limitation period set forth in subdivisions (b)(1) and (b)(2). This is why subdivision (b)(3) applies "notwithstanding" subdivision (b)(1) and (b)(2). (See *In re Greg F.* (2012) 55 Cal.4th 393, 406-407 [the phrase "notwithstanding" "signals" an intent for one statutory provision "to prevail over all contrary law"].)

15

Second, Downey SPE contends section 532, subdivision (b)(3) does not really mean what it says when it authorizes escape assessments for "each year in which the property escaped taxation or was underassessed" because at least one court—*Dreyer's Grand Ice Cream, Inc. v. County of Alameda* (1986) 178 Cal.App.3d 1174 (*Dreyer's*), superseded by § 51.5—has declared the notion of "giv[ing] [an] assessor an open-ended opportunity to impose escape assessments without any time limitation" to be "an illogical," "absurd" and "unfair result" because it could call upon a taxpayer "to challenge escape assessments levied 20 years later." (*Id.* at p. 1181.) Thus, Downey SPE argues, construing section 532, subdivision (b)(3) to allow for an unlimited reachback is foreclosed by *Dreyer's*.

We reject this contention. Whatever the *Dreyer's* court may have thought about a limitless reachback period for escape assessments, our Legislature felt differently when it enacted section 532, subdivision (b)(3) eight years after *Dreyer's*. As explained above, section 532, subdivision (b)(3)'s plain language *mandates* that escape assessments "*shall* be made *for each year in which the property escaped taxation or was underassessed*"— that is, all the way back to the initial year of the change in ownership. (§ 532, subd. (b)(3), italics added; accord, *Montgomery Ward*, *supra*, 47 Cal.App.4th at p. 1131, fn. 4 [noting how section 532's "wording was slightly altered in 1994 and the eight-year limitations period was eliminated."].) In addition to disagreeing with *Dreyer's* view of what is "absurd" and "unfair," our Legislature also disagreed in part with *Dreyer's* specific holding that an assessor may only reassess a property on a going-forward basis within four years of its initial assessment (and may not levy any retroactive escape assessments for reassessments outside

16

this window).  (*Dreyer's*, *supra*, 178 Cal.App.3d at pp. 1180-1181.)
As noted above, our Legislature enacted section 51.5, subdivision
(a) the year after *Dreyer's* came out to eliminate *Dreyer's* four-
year limitation period for reassessments where the error to be
corrected "does not involve the exercise of an assessor's judgment
as to value."  (§ 51.5, subd. (a); accord, *Blackwell Homes*, *supra*,
226 Cal.App.3d at pp. 1014-1016 [noting how section 51.5
overruled *Dreyer's* in part]; *Montgomery Ward*, at p. 1135 [same];
*Kuperman*, *supra*, 137 Cal.App.4th at pp. 923-926 [same];
*Sunrise Retirement Villa*, *supra*, 58 Cal.App.4th at p. 957 [same];
*Sea World v. County of San Diego* (1994) 27 Cal.App.4th 1390,
1399, fn. 13 [same].)  Downey SPE's argument that section 51.5
does *not* overrule *Dreyer's* because section 51.5 does not explicitly
reference section 532 ignores that section 51.5 (in subdivision (d))
explicitly authorizes escape assessments whenever
reassessments are appropriate, and ignores the solid wall of cases
cited above that recognize section 51.5's partial abrogation of
*Dreyer's*.  In sum, we decline to ignore the plain language of
section 532, subdivision (b)(3) based on language from a case that
our Legislature has superseded, including on the very point to
which that language pertains.

　　Third, Downey SPE argues for the first time in its reply
brief that the Assessor has no "standing" to file its writ petition
because the applicability of section 532, subdivision (b)(3) turns
on filing a "change in ownership statement" *with the State Board*,
such that the State Board is the only entity with standing.  Not
only has Downey SPE ostensibly waived this argument by raising
it for the first time in its reply brief on appeal (*People v. Tully*
(2012) 54 Cal.4th 952, 1075 ["It is axiomatic that arguments
made for the first time in a reply brief will not be entertained

17

because of the unfairness to the other party."]), this argument is frivolous.  A party has standing to petition for a writ of mandate if he has "a 'beneficial interest' in the outcome" of that proceeding.  (*Municipal Court v. Superior Court (Gonzalez)* (1993) 5 Cal.4th 1126, 1129.)  The Assessor most certainly has a "'beneficial interest' in the outcome" of the administrative proceeding reviewing its own levy of the escape assessments Downey SPE has elected to challenge; the writ proceedings will determine whether the Assessor's levy is legally proper.  That our Legislature has elected to require "change in ownership statement[s]" to be filed with the State Board did not somehow anoint the State Board as the legal representative of every county assessor as to every levy for which notice to the State Board is mandated by statute—or, worse yet, divest those assessors of the right to enforce and defend their own levies.  Downey SPE's argument to the contrary is without merit.

Lastly, the amicus argues that the Assessor's levy of escape assessments in 2015 is barred by the equitable doctrine of laches.  This is the first mention of laches, ever, in this case.  Such a fact-intensive doctrine cannot be raised for the first time on appeal.  (*Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624 [application of laches is a question of fact].)  In any event, laches is inapplicable both legally and factually.  Legally, "'"[l]aches is not available where it would nullify an important policy adopted for the benefit of the public."'"  (*Krolikowski v. San Diego City Employees' Retirement System* (2018) 24 Cal.App.5th 537, 568 (*Krolikowski*), quoting *City of Oakland v. Oakland Police and Fire Retirement System* (2014) 224 Cal.App.4th 210, 248.)  Applying laches here would nullify the "constitutional duty [of assessors] to levy retroactive assessments" as a means of

18

fulfilling the constitutional mandate of "equal and uniform" taxation of "all" property because it would place new limits on assessors' ability to fulfill that duty over and above the time limits created by our Legislature in section 532. (*American Airlines*, *supra*, 12 Cal.4th at p. 1127; *Biddle*, *supra*, 59 Cal. at p. 96.) Factually, laches, as an equitable doctrine, is not available to a party with unclean hands. (*Magic Kitchen LLC v. Good Things Internat., Ltd.* (2007) 153 Cal.App.4th 1144, 1165; see generally *Bakersfield Elementary Teachers Assn. v. Bakersfield City School Dist.* (2006) 145 Cal.App.4th 1260, 1275.) Downey SPE does not have "clean hands" insofar as the Assessor's alleged delay in levying the escape assessments was a direct result of *Downey SPE's* own failure to timely file an informationally sufficient document with the state agency having the expertise to evaluate that information.

Because Downey SPE's and the amicus's arguments do not obviate our need to examine section 480.1's filing requirement, we now turn to the questions of whether strict compliance with section 480.1 is required and whether it was satisfied by the recording in this case.

## II.    Was Section 480.1's Filing Requirement Satisfied?

Section 480.1 applies "[w]henever there is a change in control of any corporation, partnership, limited liability company, or other legal entity, as defined in subdivision (c) of Section 64," and requires "the person or legal entity acquiring ownership or control" (1) to file "a signed" and sworn "change in ownership statement" setting forth (a) "information relative to the ownership control acquisition transaction," including the date and parties to that transaction, (b) "all counties in which the" legal entity "owns real property," and (c) "a description of the

19

property owned by the" legal entity, and (2) to file that statement with the State Board "within 90 days from the date of the change in control of the" legal entity. (§ 480.1, subds. (a) & (b).) The statute also requires the "change in ownership statement" to contain "a notice" with statutorily specified content and to set forth that notice in a certain font size and typeface. (*Id.*, subd. (b).)

Whether Downey SPE's filing of the Certificate with the County Recorder's Office satisfies section 480.1's filing requirement turns, as a threshold matter, on whether section 480.1 demands strict compliance as to some or all of its requirements.

## A. *Must taxpayers strictly comply with section 480.1's filing requirement?*

Although courts sometimes construe statutory mandates liberally to effectuate their remedial purpose (e.g., *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 645), strict compliance with a statute is warranted when our Legislature evinces its intent that the statute's requirements are to be followed precisely. We may infer such an intent when (1) "the Legislature has provided a detailed and specific mandate" (*Harold L. James v. Five Points Ranch* (1984) 158 Cal.App.3d 1, 6; *Hub Construction Specialties, Inc. v. Esperanza Charities, Inc.* (2016) 244 Cal.App.4th 855, 862), or (2) "the intent of [the] statute can only be served by demanding strict compliance with its terms" (*County of Tulare v. Campbell* (1996) 50 Cal.App.4th 847, 853).

Our Legislature has evinced its intent that two aspects of the filing requirement set forth in section 480.1 are to be strictly enforced—namely, (1) its requirement regarding the information that must be disclosed in the filing, and (2) its requirement that

20

the filing be made with the State Board. (Accord, *Stockton Teachers Assn. CTA/NEA v. Stockton Unified School Dist.* (2012) 204 Cal.App.4th 446, 462 [holding that strict compliance is required as to a "portion of [a] statute"]; *Oberlack v. Trusas* (1944) 67 Cal.App.2d 238, 243 [same].)

To begin, the Legislature in section 480.1 has provided a "detailed and specific mandate" to the person or legal entity acquiring a property-owning legal entity—namely, that it must file a "change in ownership statement" (a) with the State Board, (b) within 90 days of the change in ownership, and (c) with a description of the transaction effecting the change in entity ownership as well as a description of each property owned and the county in which it is situated. Although, as Downey SPE correctly observes, section 480.1 does not specify that the only acceptable "change in ownership statement" is a BOE-100-B form, this does not mean that the statute's requirements as to what information a "change in ownership statement" must disclose and where and when it must be filed are not to be strictly enforced.

Further, requiring that the acquiring person or entity strictly adhere to the informational content and location-of-filing portions of section 480.1 is necessary to serve the intent behind that statute—and, by extension, section 532, subdivision (b)(3). As noted above, our Legislature defined when changes in the structure of legal entities also constitute a change in ownership of the property owned by those entities (§ 64), and did so because those entities might be otherwise able to engage in complex transactions available only to legal entities aimed at concealing changes in ownership, and thereby to evade reassessment and to sidestep the constitutional mandate of *equal* taxation of

21

individuals and legal entities.  (*Title Ins.*, *supra*, 48 Cal.3d at pp. 95-96.)  To ensure that the entity with the most expertise at parsing complex transactions between and among legal entities is given the opportunity to do so and then to give notice and guidance to the local county assessors as to whether reassessment of property owned by those entities is warranted, our Legislature mandated that the "change in ownership statement" be filed with the State Board and contain the information necessary for the State Board to conduct its nuanced analysis and then pass its guidance on to the county assessors who would need to conduct any reassessments.  (*Id.* at p. 90 [explaining how the State Board analyzes complex corporate transactions to determine whether they constitute a change in ownership and then sends an advisory letter to the assessors regarding reassessment]; *Ocean Avenue LLC v. County of Los Angeles* (2014) 227 Cal.App.4th 344, 350 [noting how the State Board "has promulgated administrative regulations interpreting the change in ownership statutes" and "[l]ocal assessors must follow the[m]"]; *926 North Ardmore, supra*, 3 Cal.5th at pp. 326, 333, fn. 15 [noting how the State Board must receive this information, but how assessors may determine for themselves whether reassessment is warranted under the State Board's regulations]; see generally, Gov. Code, §§ 15606, subd. (c), 15608 [authorizing the State Board to "instruct, advise, and direct assessors" and to "[p]rescribe rules and regulations"].)  Section 480.1's requirement that the acquiring person or legal entity file a "change in ownership statement" describing the mechanism of the acquisition as well as identifying the specific property around the state owned by the acquired entity is critical to the State Board's dual roles as a centralized clearinghouse and as a

22

repository of expertise. Thus, the intent of section 480.1 is disserved by anything less than strict compliance with its requirement that the information it mandates be disclosed in a filing made to the State Board.[8]

Downey SPE and its amicus disagree with our conclusion that strict compliance is necessary to serve the intent behind sections 480.1 and section 532, subdivision (b)(3). They cite cases holding that where "the Legislature's intent in imposing administrative exhaustion requirements" is aimed at "ensur[ing]" that the agency "receives sufficient notice of [a] claim and its basis," strict compliance is not necessary to effectuate that intent and substantial compliance—including actual notice—will suffice. (*J.H. McKnight Ranch, Inc. v. Franchise Tax Bd.* (2003) 110 Cal.App.4th 978, 986-988 (*J.H. McKnight*); see also, *ibid.* [litigant's failure to raise particular doctrine in initial pleading before administrative agency does not preclude reliance on that doctrine when agency had actual notice during the course of the administrative proceedings of litigant's reliance on that doctrine]; *Franchise Tax Bd. Limited Liability Corp. Tax Refund Cases* (2018) 25 Cal.App.5th 369, 380-387 (*Franchise Tax*) [litigants' failure to plead class claims in initial pleading before administrative agency does not preclude such claims when each

_____

8      In light of our reliance on the plain text of the pertinent statutes as well as the legislative intent derived from that text, we have no need to resort to legislative history. (E.g., *Henson v. C. Overaa & Co.* (2015) 238 Cal.App.4th 184, 198 [looking to legislative history is optional where "the statutory text is clear"].) Thus, although we have the power to judicially notice the snippets of that history proffered by the Assessor (Evid. Code, §§ 452, subd. (c), 459), we decline to do so and deny the Assessor's request for such notice as unnecessary.

23

class member individually exhausted his or her claim, such that agency had actual notice of class members' claims].) Because, they continue, the purpose of section 480.1 is also to provide the State Board and county assessors with notice of a potential need for reassessment, substantial compliance—and, in particular, actual notice—should suffice here as well.

We reject this argument. The filing requirement erected by section 480.1 is different from the pleading requirements at issue in the cases cited by Downey SPE and its amicus. The intent behind those pleading requirements had a singular goal— namely, to provide the agency with notice of the claim at issue so the agency "'has the opportunity to reevaluate its position, reach the correct result, and obviate the need for a subsequent lawsuit.'" (*Franchise Tax*, *supra*, 25 Cal.App.5th at p. 386, quoting *J.H. McKnight*, *supra*, 110 Cal.App.4th at pp. 986-987.) Because an agency could reevaluate its position as long as it received notice of the claim at issue "'from whatever source,'" demanding strict adherence to the pleading requirements was not necessary to further the intent behind those requirements. (*Ibid.*, italics omitted.) The intent behind section 480.1's requirement that persons or entities acquiring a legal entity file a "change in ownership statement" is, as explained above, twofold—namely, to (1) provide centralized notice to the State Board, which could then notify all local assessors of affected property within their counties, and (2) draw upon the State Board's specialized expertise at parsing complex transactions between and among legal entities to determine whether those transactions also effect a change in ownership of the taxable property owned by the acquired legal entity. That a local county assessor learns of a change in ownership is not enough to serve

either of these purposes because such notice does not ensure that *other* counties learn of the change in ownership and, more to the point, completely sidesteps—and thereby obviates—*the State Board's* critical role in expertly evaluating whether that change in ownership warrants reassessment. What is more, the happenstance in this case that the Assessor in the only county in which the taxpayer owned property acquired notice of a change in ownership does not override our broader analysis of legislative intent (or, for that matter, provide notice that the change in ownership *constituted a taxable event*, the very determination typically reserved for the State Board). The maxim of statutory interpretation cited by Downey SPE (namely, that ambiguous statutes are to be "construed most strongly against the government and in favor of the taxpayer" (*Dreyer's*, *supra*, 178 Cal.App.3d at p. 1182)) adds nothing to our analysis because it is inapplicable (because, as we conclude, sections 480.1 and 532 are not ambiguous), is contradicted by a dueling maxim (*IBM Personal Pension Plan v. City and County of San Francisco* (2005) 131 Cal.App.4th 1291, 1299 [statutes governing tax refund actions are to be strictly construed]), and cannot in any event override our Legislature's clear intent to require strict compliance with some of section 480.1's requirements.

### B. *Does Downey SPE's filing strictly comply with section 480.1?*

It is undisputed that Downey SPE's act of recording the Certificate with the County Recorder's Office did not strictly comply with section 480.1's informational requirements (because it lacked several categories of information) or with section 480.1's requirement that the information be provided to the State Board.

25

## DISPOSITION

The judgment is affirmed. The Assessor is entitled to his costs on appeal.

**CERTIFIED FOR PUBLICATION.**

_____, J.
HOFFSTADT

I concur:

_____, Acting P. J.
ASHMANN-GERST

26

Prang v. Los Angeles County Assessment Appeals Board No. 2
B301194

BAKER, J., Concurring

The opinion the majority publishes today decides more than necessary and proceeds on a largely undefined dichotomy: "strict compliance" on one hand and some background notion of "substantial compliance" on the other.  I agree we must affirm the result the trial court reached on the facts of this case, but I write separately to distance myself from the majority's observations that are unnecessary to the result it reaches.

Revenue and Taxation Code section 532 establishes the conditions under which a local assessor may seek to retroactively collect taxes on real property it did not timely reassess.[1]  I agree the statute allows retroactive reassessment of property taxes due without limit (i.e., for each year in which the property was underassessed or "escaped taxation") when ownership or control of the property changes and "a change in ownership statement, as required by Section 480.1 or 480.2 [i]s not filed with respect to the event giving rise to" taxes owed but not collected.  (§ 532, subd. (b)(3); see also § 480.1, subd. (e) ["The . . . assessors may inspect any and all records and documents of a corporation, partnership, limited liability company, or legal entity to ascertain whether a change in control as defined in subdivision (c) of Section 64 has occurred"].)  Stated simply, then, the proper outcome in this case turns on whether the property owner here

_____

1      Undesignated statutory references that follow are to the Revenue and Taxation Code.

submitted a change in ownership statement as required by one of these two cross-referenced subsections.

The assessment appeals board below considered information "in oral and written form" that the property owner provided to the office of the Los Angeles County Assessor (the Assessor) and made an express factual finding that the Assessor had "actual and constructive notice of [a] change in control/ownership" of the subject property in 2009. This finding of actual notice is effectively a determination that the Assessor knew a reassessment of the subject property was necessary at that time but did nothing. Arguably, the appeals board's finding, which is due some deference on appeal, could suffice to establish *the Assessor* was given information that should bar unlimited retroactive assessments. Answering that question definitively will have to wait for another day, however, because there is an obvious problem here that defeats the taxpayer's position.

Subdivision (a) of section 480.1 (the pertinent statute of the two cross-referenced in section 532, subdivision (b)(3)) states: "Whenever there is a change in control of any corporation, partnership, limited liability company, or other legal entity, as defined in subdivision (c) of Section 64, a signed change in ownership statement as provided for in subdivision (b), shall be filed by the person or legal entity acquiring ownership control of the corporation, partnership, limited liability company, or other legal entity with the [State Board of Equalization] at its office in Sacramento within 90 days from the date of the change in control of the corporation, partnership, limited liability company, or other legal entity." The assessment appeals board made no finding that a change of ownership statement had been timely filed with the State Board of Equalization, nor a determination

that the State Board of Equalization had actual notice in 2009 of a change in ownership or control of the subject property. To the contrary, the majority correctly states it is undisputed that the owner of the subject property did not file a change in ownership statement with the State Board as required by section 480.1.

That is dispositive of the issue presented in this appeal. As the majority says in answering its own question at the outset of its opinion, "no," a taxpayer cannot avoid unlimited retroactive assessments when the taxpayer does not give notice of a change in ownership to the statutorily described entity, the State Board of Equalization. Stopping with that unassailable and unremarkable holding would have been wise.

But the majority's opinion says more. It uncritically accepts the Assessor's framing of the question to be decided in this litigation, a framing that maintains (wrongly) we must decide whether section 480.1 requires so-called strict compliance with its terms. (Rec. of Oral Arg. at 11:02-11:20 [counsel for respondent's statement that "[t]he way we presented the case to [the trial court judge] was: does this particular statute, [section] 480.1, have to be strictly enforced because the assessment appeals board crafted a substantial compliance exception to it"].) In accepting that framing, the majority gives the Assessor license to deploy today's opinion to excuse derelict performance by his office so long as the taxpayer in question—no matter her, his, or its good-faith—does not perfectly jump through all bureaucratic hoops erected pursuant to the statutory scheme (see generally § 480.1, subd. (b)). Astute readers of the majority's opinion, however, will understand this case ultimately stands for one proposition and one proposition only: if you notify your local assessor's office of a change in ownership or control but do not

notify the State Board of Equalization, you will be on the hook for unlimited retroactive property tax assessments even if the assessor's office neglects to undertake a timely reassessment.


                               _____, J.

                               BAKER*

---

* Associate Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.